James M. BANNER, Jr.,
et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV.A. 03–1587(ESH).

United States District Court,
District of Columbia.

March 11, 2004.

John W. Nields, Jr., Howrey Simon Arnold & White, LLP, Lois G. Williams,

Washington Lawyers' Committee for Civil Rights & Urban Affairs, Walter Smith, D.C. Appleseed Center, Gary Thompson, Gilbert Heintz & Randolph, Washington, DC, for Plaintiffs.

Michael D. Berman, Office of the Attorney General, Baltimore, MD, Rupa Bhattacharyya, Theodore C. Hirt, U.S. Department of Justice, Washington, DC, Maureen R. Matsen, William H. Hurd, Office of Attorney General, Richmond, VA, for Defendants.

Sharon E. Pandak, Ross G. Horton, Prince William, VA, for Amicus Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

This lawsuit presents yet another chapter in the District of Columbia's longstanding struggle to achieve self-government. The District, its Mayor, its Council and Council members, and eighteen of its residents challenge Congress' refusal to permit taxation of income earned by nonresidents who work within its borders. Plaintiffs contend that the ban constitutes unconstitutional discrimination against residents of the District, who lack the right to vote in Congress. Arguing that commuters in the District should be required to compensate the jurisdiction in which they are employed for the costs they impose, plaintiffs charge that the District's inability to tax nonresidents creates financial deficits not counterbalanced by its federal subsidies, forcing it to impose disproportionately high tax burdens upon its own residents. *Amici* for plaintiffs argue that the District is the only jurisdiction in the United States denied the benefit of taxing income earned within its borders, and that even the federal government profits from the income earned by foreigners within the nation's borders.[1]

Plaintiffs' grievances are serious, and their goal is a laudable one. The unfairness of the District's situation is obvious and regrettable. Since the establishment of the District, courts have, however, understood that its unique constitutional position results in unfairness. As early as 1805, then Chief Justice Marshall recognized the inequities compelled by the Constitution as he concluded that the Supreme Court could not grant the District the same benefits enjoyed by the states. *See Hepburn & Dundas v. Ellzey*, 6 U.S. (2 Cranch) 445, 453, 2 L.Ed. 332 (1805). Chief Justice Marshall's sentiments have been reiterated in subsequent Supreme Court decisions, as well as in rulings from courts in this jurisdiction, all of which have upheld the District's lack of congressional representation. *See, e.g., Loughborough v. Blake*, 18 U.S. (5 Wheat.) 317, 324–25, 5 L.Ed. 98 (1820) ("Although in theory it might be more congenial to the spirit of our institutions to admit a representative from the district, ... certainly the constitution does not consider their want of a representative in Congress as exempting it from equal taxation."); *United States v. Thompson*, 452 F.2d 1333, 1341 (D.C.Cir. 1971) ("[F]or residents of the District, the right to vote in congressional elections is ... totally denied. This regrettable situation is the product of historical and legal forces over which this court has no control."); *Adams v. Clinton*, 90 F.Supp.2d 35, 37 (D.D.C.), *aff'd*, 531 U.S. 941, 121 S.Ct. 336, 148 L.Ed.2d 270 (2000) ("[T]he dictates of the Constitution and the decisions of the Supreme Court bar us" from granting District residents the "right to elect representatives to the Congress of the United States.").

This Court is likewise mindful of the unfairness of the situation plaintiffs seek to change. But longstanding judicial precedent compels the Court to conclude that plaintiffs do not enjoy the right they seek to obtain. As has been the case for over

---

1. Concerned with the fiscal health of the District, the District of Columbia Affairs Section of the District of Columbia Bar and most of the Bar's former presidents have joined plaintiffs as *amici curiae*.

two hundred years, the residents of this jurisdiction "must plead their cause in other venues," for this Court has no authority to overturn Congress' ban on a commuter tax. *Adams*, 90 F.Supp.2d at 72.

## BACKGROUND

The District of Columbia is "an exceptional community ... established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy*, 314 U.S. 441, 452, 62 S.Ct. 303, 86 L.Ed. 329 (1941).[2] The Constitution grants to Congress plenary legislative authority over the District: "The Congress shall have the power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States ...." U.S. Const. art. I, § 8, cl. 17 ("the District Clause").

Until recently, Congress exercised its exclusive control over the District through direct legislation and the appointment of local governors, with only minimal input from residents. *See Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C.Cir.2002). In 1871, when Washington City, Georgetown, and Washington County were combined to create the District of Columbia, the Organic Act provided for a presidentially-appointed District governor and a legislature with limited power. *See Dist. of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 105, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953); An Act for the Government of the District of Columbia, ch. 62, 16 Stat. 419 (1871). This attempt to provide the District with territorial home rule lasted only a few years, for Congress revoked the self-government provisions of the Organic Act in 1878, and for almost a century

the District was governed by a three-person commission appointed by the President. *See Adams*, 90 F.Supp.2d at 47 n. 19; An Act for the Government of the District of Columbia, and for Other Purposes, ch. 337, 18 Stat. 116 (1874); An Act Providing a Permanent Form of Government for the District of Columbia, ch. 180, 20 Stat. 102 (1878).

Between 1948 and 1966, the Senate passed six different bills granting the District some form of home rule, but each time a similar bill died in the House Committee for the District of Columbia. The commissioner system was replaced in 1967 by a presidentially-appointed mayor and council form of government, *see Adams*, 90 F.Supp.2d at 47 n. 19; *see also* Reorganization Plan of 1967, Pub.L. No. 90–623, 81 Stat. 948 (1967), and in 1973, Congress enacted the "Home Rule Act," providing for a mayor and council elected by the citizens of the District. *See* District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973) (codified as amended at D.C.Code Ann. § 1–201.01 *et seq.*) ("the Act"). The existing local government provides the District with the most expanded form of self-government to date.

The Home Rule Act delegates to the District of Columbia Council "certain legislative powers," "[s]ubject to the retention of Congress of the ultimate legislative authority over the nation's capital." D.C.Code Ann. § 1–201.02. The Act protects Congress' exclusive legislative authority over the District by providing that Council enactments become law only if Congress declines to pass a joint resolution of disapproval within thirty days (or sixty days in the case of criminal laws) and by reserving the power to repeal Council

---

**2.** The historical forces that led to the establishment of exclusive federal control over the nation's capital are explained in *Adams*, 90 F.Supp.2d at 50 n. 25.

enactments at any time. *See id.* §§ 1–206.01, 1–206.02(c)(1)–(c)(2).

The Act also specifically limits the Council's lawmaking powers, enumerating matters that are not "rightful subjects of [Council] legislation." *Id.* § 1–203.02. The District may not, for example, impose any tax on federal property; it may not regulate federal or local courts, or the Commission on Mental Health; and it may not permit the construction of buildings taller than certain height restrictions. *See id.* § 1–206.02(a)(1)–(a)(8). Plaintiffs' challenge in this case addresses the Act's commuter tax prohibition (the "Prohibition"), which is among these enumerated limitations: "The Council shall have no authority to . . . [i]mpose any tax on the whole or any portion of the personal income, either directly or at the source thereof, of any individual not a resident of the District . . . ." *Id.* § 1–206.02(a)(5).

Congress passed the Home Rule Act as a compromise, granting "the people of the District of Columbia an opportunity in exercising their rights once more and yet with adequate safeguards for the Federal interest component." Home Rule for the District of Columbia, 1973–1974: Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills Culminating in the District of Columbia Self–Government and Governmental Reorganization Act, at 2106 (1974) (statement of Rep. Diggs, reprinted from the Cong. Rec., Oct. 9, 1973). The Chairman of the Committee on the District of Columbia viewed the legislation as "a reasonable and rational accommodation between the interests of all Americans in their Nation's Capital and the basic principle that government should be responsible to the people." *Id.* at 3052 (statement of Rep. Diggs, reprinted from the Cong. Rec., Dec. 17, 1973).

The Act provided for an annual federal payment to be allotted to the District upon the Mayor's request. To formulate the fund petition, the Mayor was to "prepar[e] an annual budget for the government of the district, . . . identify[ing] elements of cost and benefits to the district which result from the unusual role of the district as the Nation's Capital," considering, among other things, the "potential revenues that would be realized if exemptions from district taxes were eliminated," and the "relative tax burden on District residents compared to that of residents in other jurisdictions in the . . . metropolitan area and in other cities of comparable size." D.C.Code Ann. §§ 1–205.01(a), (b)(3), (b)(9) (repealed 1997). Thereafter, Congress authorized a maximum annual amount for the appropriation. The federal payment was not to exceed $230 million for the fiscal year ending June 30, 1975, $254 million for 1976, $280 million for 1977, and $300 million for 1978. *Id.* §§ 1–205.02 (repealed 1997). By the mid–1990s, the federal payment had increased to $660 million per year.

By 1997, however, lawmakers concluded that the "financial constraints uniquely applicable to the District" required greater federal budgetary and management responsibility "for some very costly District operations which are either state-like functions which virtually no other city in the nation performs, or which are burdens which the federal government itself created and unfairly transferred to the District government as part of the home rule deal." *Hearing before the Senate and House District of Columbia Subcommittees on the President's National Capital Revitalization and Self–Government Improvement Plan,* 105th Cong. (1997) (statement of Charlene Drew Jarvis, District of Columbia Councilmember). Thus, through the National Capital Revitalization and Self–Government Improvement Act of 1997, Pub.L. 105–33, 111 Stat. 712 (§§ 11000–

11723) (1997) ("the Revitalization Act"), Congress repealed the federal payment provision of the Home Rule Act, and began to subsidize some of the District's "state functions," including its transportation and infrastructure system development, pension liabilities, Medicaid program payments, and courts and prison system management.[3]

Through the Revitalization Act, Congress attempted to financially compensate the District for costs associated with "the extraordinary Federal presence," including "crowd control, restrictions on revenue raising capacity because of tax exempt property, height restrictions, and *restrictions on non-residence income taxes.*" *Hearing before the House District of Columbia Subcommittee on the White House Plan to Revitalize D.C.*, 105th Cong. (1997) (statement of Andrew Brimmer, Chairman, District of Columbia Financial Responsibility and Assistance Authority) (emphasis added). The "forgone nonresident income taxes" were "estimated to be $1.2 billion annually," an amount only expected to increase "as more District residents migrate to neighboring jurisdictions—but continue to work in the city." *Id.* Congress was, therefore, directed to take into account the restrictions upon the overall size of the District's economy and the limitations upon its ability to tax income when determining "such amount as may be necessary" for the District's appropriation. *See* Revitalization Act, Pub.L. 105–33, 111 Stat. at 778 (§ 11601(c)(1), (c)(2)(B)). Thus, despite concerns surrounding the discontinuation of the District's federal payment, the Revitalization Act was touted as " 'the most promising and certainly the most in-

novative approach yet to emerge for relieving the District government of costs it can no longer shoulder.' " David A. Vise, *Clinton Proposes U.S. Run Many D.C. Services*, Washington Post, Jan. 14, 1997, at A1 (quoting Del. Eleanor Holmes Norton).

While income tax from commuters would undeniably increase the District's revenues, Congress has chosen to address the District's financial situation through other means, and has rejected every proposed commuter tax since 1975. Bills introduced shortly after the passage of the Home Rule Act sponsored by Representative McKinney (Amendment to the District of Columbia Income and Franchise Tax Act of 1947, H.R. 11579, 94th Cong. (1976)) and Representative Dellums (Amendment to the District of Columbia Self–Government and Governmental Reorganization Act, H.R. 11303, 95th Cong. (1978)) died in committee. More recent proposals introduced by District Delegates Walter Fauntroy (Amendment to the District of Columbia Self–Government and Governmental Reorganization Act, H.R. 2641, 99th Cong. (1985)) and Eleanor Holmes Norton (District of Columbia Fair Federal Compensation Act of 2002, H.R. 3923, 107th Cong. (2002)) have suffered similar fates. Former District Mayor Sharon Pratt Kelly launched a highly-publicized campaign in 1992 promoting a commuter tax, but gave up her efforts in response to political pressure. *See* Kent Jenkins, Jr., *Kelly Drops Commuter Tax Effort*, Washington Post, Dec. 6, 1992, at A1.

Plaintiffs now challenge Congress' refusal to permit passage of a commuter tax. While plaintiffs cite to the Equal Protec-

---

**3.** The Revitalization Act also provides for U.S. Treasury loans, as well as other grants and tax incentives, in order to "relieve the district government of major financial and managerial responsibilities ... [and] help the city resolve its cash shortfall that stems from its accumulated deficit." *Hearing before the House District of Columbia Subcommittee on President Clinton's Plan to Help Restore the Economic Health of the City,* 105th Cong. (1997) (statement of Franklin Raines, Director, Office of Management and Budget).

tion, Uniformity, and Privileges and Immunities Clauses as the grounds for invalidating the Prohibition, these claims are premised on a series of Supreme Court tax cases that plaintiffs use to craft a legal principle outlawing discrimination in the imposition of taxes against unrepresented citizens in favor of represented ones. Applying this principle to Congress' ban on the District's use of a commuter tax, plaintiffs argue that the Prohibition must be invalidated.

Defendants and the intervenors (the State of Maryland and the Commonwealth of Virginia) have moved to dismiss plaintiffs' claims.[4] As an initial matter, they challenge the Court's subject matter jurisdiction arguing that plaintiffs lack standing to challenge the Prohibition and that the issue is nonjusticiable because it presents a political question. As to the merits, defendants and the intervenors seek dismissal on the grounds that since Congress' prohibition on a commuter tax is constitutionally permissible under its plenary power over the District, there is no legal basis for invalidating Congress' action. Having heard oral argument on the motions to dismiss on February 17, 2004, the Court will now turn to defendants' jurisdictional

arguments, as well as their arguments regarding plaintiffs' constitutional claims.

## · JURISDICTION

### I. STANDING

■ Plaintiffs have standing if they have suffered an "injury in fact," are able to establish a causal connection between the injury and the offensive conduct, and demonstrate that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The complaint alleges that approximately 500,000 residents commute into the capital each workday, imposing significant uncompensated costs on the District. As a result of the District's inability to tax these commuters, the individual plaintiffs "bear substantially higher than normal tax burdens," while the District "perennially suffers revenue deficiencies," as well as "an inability to fund critical infrastructure improvements."[5] (Compl.¶¶ 50–52.) These injuries are not "conjectural or hypothetical," they are specifically alleged, and they are suffered only by the District and its residents. *See· Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. Thus, contrary to defen-

4. Plaintiffs have named the United States, the Department of Justice, and Attorney General John Ashcroft as defendants. The Commonwealth of Virginia and the State of Maryland joined the defendants as intervenors and have moved to dismiss plaintiffs' complaint as well. An *amicus* brief in support of Virginia's motion was filed by the Virginia jurisdictions of Fairfax County, Loudoun County, Prince William County, the City of Alexandria, the City of Falls Church, the City of Manassas, and the City of Manassas Park.

5. Plaintiffs describe the District's financial situation by reference to a United States General Accounting Office report, issued on June 5, 2003, which concluded that there is a "substantial structural imbalance in the District,"

meaning that "even if the District's services were managed efficiently, the District would have to impose above-average tax burdens just to provide an average level of services," despite the District's receipt of federal funds. (Opp. at 10; Compl. ¶¶ 38–40.) The District's inability to tax nonresidents' income, plaintiffs maintain, deprives it of up to $1.4 billion in tax revenues each year, forcing it to tax its residents at a higher rate while providing them fewer services. If the District were to tax its residents at average rates, they allege, its revenues would fall short by between $470 million and $1.1 billion each year. At this stage, the Court must accept plaintiffs' factual allegations as true for purposes of deciding defendants' motions to dismiss.

dants' contention, plaintiffs' challenge is not a generalized taxpayer grievance where the injury is undifferentiated and common to all members of the public. *See id.* at 575–76, 112 S.Ct. 2130. Instead, the legislative act at issue allegedly unconstitutionally burdens a particular class of citizens, and "[t]he burden alone is sufficient to establish standing." *Orr v. Orr,* 440 U.S. 268, 273, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979).[6]

The complaint also contains sufficient allegations to establish a causal connection between the injury and the District's inability to tax commuters, claiming that the inability to tax commuters "is the substantial cause of the District's structural deficit" that forces it to overtax its residents and to reduce necessary public services. (Compl.¶ 38.) But for the commuter tax ban, plaintiffs contend, the Council could "tax non-resident income earned within its borders [providing] hundreds of millions of dollars in needed revenue for the District [which would] ease the burden on overtaxed District residents [and] provide more and better services to residents and nonresidents." (*Id.* ¶ 53.)[7]

Finally, defendants challenge the redressibility of plaintiffs' injury, pointing to the fact that, in the event that the Court were to strike down the Prohibition, relief would be obtained only if the Council were to enact a commuter tax and Congress were to abstain from exercising its veto power over such legislation, which, as defendants argue, would be highly unlikely given its consistently hostile response to such legislation.[8] The complaint disposes

6. Defendants argue that the District and its Council lack standing because they "have neither a 'right' nor a 'legally-protected interest' in making any legislative determination for the District." (Mot. at 17.) This position misconstrues the standing requirement. The Court must presume for purposes of standing analysis that plaintiffs have the right they claim. *See Adams,* 90 F.Supp.2d at 41 (presuming that District residents are entitled to representation in the House and concluding that denial of such a voice "plainly constitutes an 'injury in fact' "); *see also Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ... "); *Catholic Soc. Serv. v. Shalala,* 12 F.3d 1123, 1126 (D.C.Cir.1994) (for the purposes of standing analysis, the Court assumes the validity of the substantive claim). The District and its Council clearly have standing in their own right, *see Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (where the effect of an Oklahoma statute was to deprive Wyoming of severance tax revenues, Wyoming had standing), and in any event, because the individual plaintiffs have standing, the Court need not find an independent basis for institutional standing. *See Adams,* 90 F.Supp.2d at 45 n. 12.

7. Defendants argue that only the United States is a proper defendant, and that the United States Department of Justice and the Attorney General should be dismissed. The contested defendants, however, are properly named when plaintiffs challenge a statute as unconstitutional. *See, e.g., Am. Library Ass'n v. Barr,* 956 F.2d 1178, 1197 (D.C.Cir.1992); *Seegars v. Ashcroft,* 297 F.Supp.2d 201, 203 (D.D.C.2004).

8. Efforts to bring up the commuter tax issue have been met with vocal opposition. For example, when Senator Harkin reopened the idea in 1988, he received much criticism. Representative Hoyer responded that "[t]he chance of that happening ... is zero." Tom Sherwood, *Commuter Tax Controversy Rekindled in D.C. Budget Meeting,* Washington Post, May 26, 1988, at B11. Discussing a proposed legislative amendment that would create a commuter tax, Representative Harris of Virginia stated that it was impossible for him "to be altruistic when it comes to the commuter tax question." *Commuter Tax: Hearings and Markup on H.R. 11303 & 10116 Before the House Subcommittee on the District of Columbia,* 95th Congress (1978). The issue was the source of such contention in debates surrounding potential District statehood in 1988 that District Delegate Fauntroy was forced to assure wavering supporters of statehood that,

of the first concern, by including a Council declaration stating that if it could, "the Council would enact a law to reduce income tax rates on its overtaxed residents and impose a fair and reasonable income tax on non-residents." (Mot. at 31 (citing Compl. ¶¶ 44, 53–55).) And, although the Act entitles Congress to veto or repeal laws enacted by the Council, if the Court were to hold the Prohibition unconstitutional, its holding would prohibit Congress from exercising these powers on a commuter tax law passed by the Council. *See Adams*, 90 F.Supp.2d at 42 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (the Court may "assume that the President and the congressional officials would then follow the law as the Court articulated it")). Moreover, the possibility that a coordinate branch might subsequently negate or undermine the Court's relief does not necessarily destroy standing. *See Swan v. Clinton*, 100 F.3d 973, 980–81 (D.C.Cir.1996). Plaintiffs therefore have standing to bring their challenge.

## II. POLITICAL QUESTION

■ The political question doctrine arises from two constitutional principles: the separation of powers among the three coordinate branches of government and the inherent limits on judicial capabilities. *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1378–79 (D.C.Cir.1981) (citing *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).[9] The doctrine prohibits a court from interfering in a political matter that is principally within the dominion of another branch of government. *See Spence*, 942 F.Supp. at 39.

■ The issue here is whether the Court can review plaintiffs' constitutional challenge to the Prohibition by applying manageable standards without usurping Congress' authority over the District. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691. Defendants argue that because Congress' power over the District is "plenary in every respect," its decision to enjoin the imposition of a nonresident income tax is one for "legislative, not judicial, consideration." (Mot. at 12–13.) Moreover, because they contend that plaintiffs do not have the rights they claim, they argue that there are no appropriate standards to review plaintiffs' challenge. (*Id.* at 16.)

That Congress' power is "plenary" is, as even defendants admit (*see id.* at 14 n. 5), insufficient to insulate a law from judicial review. *See, e.g., INS v. Chadha*, 462 U.S. 919, 940–41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("The plenary authority of Congress over aliens ... is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permis-

as a state, the District would not impose a commuter tax. *See* Tom Sherwood, *Commuter Taxation Controversy Rekindled in D.C. Budget Meeting*, Washington Post, May 26, 1988, at B11.

9. In *Baker*, the Supreme Court articulated six factors which guide the identification of a non-justiciable political question: a "textually demonstrable constitutional commitment of the issue to a coordinate political department," a "lack of judicially discoverable and manageable standards for resolving it," the "impossibility of deciding without an initial policy determination of a kind clearly for non-

judicial discretion," the "impossibility of a Court's undertaking independent resolution without expressing lack of respect due coordinate branches of government," an "unusual need for unquestioning adherence to a political decision already made," or the "potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. 691. "The presence of any one of these factors is sufficient to render an issue nonjusticiable." *Spence v. Clinton*, 942 F.Supp. 32, 39 (D.D.C. 1996).

sible means of implementing that power."); *Delaware Tribal Bus. Comm. v. Weeks,* 430 U.S. 73, 84, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) (quoting *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 54, 67 S.Ct. 167, 91 L.Ed. 29 (1946) ("The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute.")). Congress can exercise its plenary power over the District only "so long as it does not contravene any provision of the Constitution of the United States." *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Turner v. Dist. of Columbia Bd. of Elections & Ethics,* 77 F.Supp.2d 25, 29–30 (D.D.C.1999).

> Just as this Court may strike down as unconstitutional legislation enacted by Congress for the entire country, the Court is fully empowered to review legislation for the District of Columbia for constitutional infirmities .... Congress' plenary power to legislate for the District of Columbia in no way strips this Article III Court of its authority, and its duty, to consider claims of constitutional violations.

*Marijuana Policy Project v. Dist. of Columbia Bd. of Elections and Ethics,* 191 F.Supp.2d 196, 205 (D.D.C.), *rev'd on other grounds,* 304 F.3d 82 (D.C.Cir.2002).

As in *Marijuana Policy Project,* plaintiffs present a justiciable issue. That case involved a First Amendment challenge to Congress' refusal to allow the District to enact any law reducing marijuana penalties. *See* 304 F.3d at 83. The district court concluded that the government's "suggestion that this Court should ignore the clear constitutional concerns raised by [the law] in deference to Congress' plenary power to *legislate* is wholly without merit." 191 F.Supp.2d at 205. *See also Firemen's Ins. Co. of Washington, D.C. v. Washington,* 483 F.2d 1323, 1327 (D.C.Cir.1973) (quoting *Thompson Co.,* 346 U.S. at 109, 73

S.Ct. 1007) ("Congress may delegate to the District government that 'full legislative power, *subject of course to Constitutional limitations to which all lawmaking is subservient* ....' ") (emphasis added).

Moreover, "[j]udicial standards under the Equal Protection Clause are well developed and familiar." *Baker,* 369 U.S. at 226, 82 S.Ct. 691. Plaintiffs have challenged the commuter tax provision of the Home Rule Act as unconstitutionally discriminatory, and this Court has the duty to presume that they have the right they claim and thus has the power to review the challenged legislation for constitutional infirmity. *See Norwalk Core v. Norwalk Redev. Agency,* 395 F.2d 920, 929 (2d Cir.1968) ("Plaintiffs here complain that they were denied the equal protection of the laws ... and this, at least, is a justiciable claim."); *see also Adams,* 90 F.Supp.2d at 40 (plaintiffs' voting rights claim is justiciable because it cannot be assumed "that plaintiffs cannot prove what they allege"). As recognized by defendants during argument on these motions, "if the question is [whether] the action of Congress here [is] prohibited by the Equal Protection Clause or the Uniformity Clause, that's a question of law that this Court can certainly decide." (February 17, 2004 hearing transcript ["Tr."] at 37.) Because that is indeed the very question that plaintiffs present, the political question doctrine does not bar their claim, and the Court has jurisdiction to consider plaintiffs' constitutional arguments.

## CONSTITUTIONAL CLAIMS

### I. PLAINTIFF'S LEGAL THEORY

 Plaintiffs attack the Prohibition by arguing that it discriminates in favor of Congress' own constituents (particularly the residents of Maryland and Virginia) against unrepresented citizens (the resi-

dents of the District). Their attack is premised on two arguments: (1) the law, relating to state taxation schemes prohibits a legislature from imposing a tax that favors its constituents at the expense of nonconstituents, and (2) based on this principle, Congress' legislative action here must be invalidated. As discussed herein, these arguments are unpersuasive.

Before addressing the flaws in plaintiffs' arguments, it is necessary to explicate plaintiffs' legal theory and to discuss the authorities upon which they rely. Plaintiffs, citing a line of Supreme Court tax cases, contend that "in a representative government, the representatives are going to have an inherent bias in favor of their constituents" (Tr. at 70), and that "when a legislature discriminates against the unrepresented in favor of the represented" in enacting tax laws, such legislation is "simply illegitimate." (*Id.* at 31 ("[I]n our view, if you read the cases together, it appears to us that the Court is effectively laying down that principle. It is forbidden, whether we're invoking the Privileges and Immunities Clause or the Equal Protection Clause, the Court uses the same analysis.").) Thus, they claim that, at least in the area of taxation, a citizen who has "no voting representation in the halls of the legislature that did the discriminating" is entitled to have the Court "take a harder look" at the legislature's action (Tr. at 36), and if this standard is applied here, the commuter ban will not survive because it deprives District residents of the right to equal treatment.[10]

In making this argument, plaintiffs rely on several Supreme Court cases that provide that if a state chooses to tax its residents' income, it may also tax earnings of nonresidents employed within its borders as long as the nonresident tax is "of like character, and not more onerous in its effect" than the tax imposed on residents. *Shaffer v. Carter,* 252 U.S. 37, 52, 40 S.Ct. 221, 64 L.Ed. 445 (1920). These cases strike down tax laws that impose a more onerous burden on nonresidents than residents based on "the federal right of a nonresident . . . to equal treatment." *Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 572, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949) (striking down an *ad valorem* tax against certain intangible property of nonresident corporations that was not imposed on resident corporations); *see also Lunding v. N.Y. Tax Appeals Tribunal,* 522 U.S. 287, 310, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) (striking down a "facially inequitable and essentially unsubstantiated taxing scheme that denies only nonresidents a tax deduction for alimony payments"); *Metro. Life Ins. Co. v. Ward,* 470 U.S. 869, 878, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (striking down a state statute imposing a substantially lower tax rate on domestic companies than out-of-state ones).

In particular, the cornerstone of plaintiffs' theory is Justice Brennan's concurrence (joined by Justice Harlan) in *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 533, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959), and the Supreme Court's decision

---

**10.** As argued by plaintiffs' counsel:

Congress has an inherent bias in favor of its constituents . . . . And that's why Chief Justice Marshall said in *Loughborough* that the unrepresented District residents were protected by a right of equal treatment. It's why the Supreme Court said in *Austin v.* *New Hampshire* that Maine residents are protected by a right of equal treatment. It's why in case after case that we've cited, the Court said the right of the nonresident is the right to equal treatment.

(Tr. at 70.)

in *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975).[11] In *Allied Stores*, the Court upheld an Ohio taxing scheme *favoring* nonresidents of the state against an equal protection attack brought by Ohio residents. In reaching its conclusion, the majority observed that the "Equal Protection Clause ... imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." *Id.* at 526, 79 S.Ct. 437. Applying this principle, the Court concluded that a state's desire to promote "the location within the State of needed and useful industries by exempting them" from taxes provided a rational basis for upholding Ohio's tax that discriminated against residents in favor of nonresidents. *Id.* at 528–29, 79 S.Ct. 437. Justices Brennan and Harlan concurred, explaining that the Ohio tax in *Allied Stores* was unlike the tax in *Wheeling*, for the latter burdened nonresidents as compared to residents solely because they are nonresidents, which "is outside the constitutional pale," whereas the *Allied Stores* tax *favored* nonresidents, thus presenting "no state action disruptive of the federal pattern." *Id.* at 533, 79 S.Ct. 437. In agreeing that the *Allied Stores* tax was proper, Justice Brennan opined that a rational basis for such a tax

> could, in fact, be found in the concept that is proper that those who are bound to a State by the tie of residence and accordingly more permanently receive its benefits are proper persons to bear the primary share of its costs. Accordingly, in this context, it is proper to say

that any relief forthcoming must be obtained from the State Legislature.

*Id.* at 533, 79 S.Ct. 437.

This concurrence is cited by the Supreme Court in *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975), where the Court invalidated, under the Privileges and Immunities Clause, a New Hampshire commuter tax on the grounds that out-of-state residents who worked in New Hampshire paid taxes on income earned there, whereas New Hampshire residents did not. The Court applied a "substantially more rigorous" standard of review given the need for "heightened concern for the integrity of the Privileges and Immunities Clause" and concluded:

> The Privileges and Immunities Clause, by making noncitizenship or nonresidence an improper basis for locating a special burden, implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so, the structural balance essential to the concept of federalism. Since nonresidents are not represented in the taxing State's legislative halls, *cf. Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 532–533, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) (Brennan, J., concurring), judicial acquiescence in taxation schemes that burden them particularly would remit them to such redress as they could secure through their own State; but to prevent (retaliation) was one of the chief ends sought to be accomplished by the adoption of the Constitution.

*Id.* at 662, 95 S.Ct. 1191 (citation omitted).

From these two cases, plaintiffs extrapolate a legal axiom: *Austin's* "rigorous

---

**11.** Plaintiffs also rely on dicta from *Loughborough*, where Chief Justice Marshall observed:

> If it be said, that the principle of uniformity, established in the constitution, secures the district from oppression in the imposition of indirect taxes, it is not less true, that

the principle of apportionment, also established in the constitution, secures the district from any oppressive exercise of the power to lay and collect direct taxes.

18 U.S. (5 Wheat.) at 325, 5 L.Ed. 98.

standard of review" is applicable to the commuter tax ban, since it is the product of Congress' inherent bias in favor of its constituents and it deprives the District residents, who lack congressional representation, of equal treatment. (*See* Tr. at 74; *see also* Opp. at 5, 15 ("[W]hen a legislature discriminates—in a matter of taxation—in favor of its own constituents and against people who are represented, the court will scrutinize this discrimination closer.").)

The axiom that plaintiffs advance, however, simply cannot be derived from the case law they present. First, they misread the concurring opinion in *Allied Stores*. Although Justices Harlan and Brennan closed by commenting that "any relief forthcoming must be obtained from the State Legislature," 358 U.S. at 533, 79 S.Ct. 437, a fair reading of their opinion does not, as plaintiffs argue, lead to the conclusion that a tax law is subject to rigorous analysis if it is imposed by a legislature that does not include representatives of those who are taxed. (*See* Tr. at 15–16.) Instead, the concurrence concluded that in order to properly distinguish cases such as *Wheeling*, in which the state unconstitutionally discriminated against nonresidents, and *Allied Stores*, where the state constitutionally discriminated against its own residents, "the answer lies in remembering that our Constitution is an instrument of federalism." 358 U.S. at 532, 79 S.Ct. 437. Because it involved a state tax that operated *against* its own residents, *Allied Stores* "clearly presents no state action disruptive of the federal pattern," and, thus, there was "no reason to judge the state action mechanically by the same principles as state efforts to favor residents." *Id.* at 533, 79 S.Ct. 437. Ac-

cording to the concurrence, "*Wheeling* applied the Equal Protection Clause," not to protect nonvoters of the taxing legislature, but "to give effect to its role to protect our federalism by denying Ohio the power constitutionally to discriminate in favor of its own residents." *Id.*[12]

*Austin* affirmed the conclusion that tax laws that unfairly burden nonresidents must be struck down to protect "the structural balance essential to the concept of federalism." *Austin*, 420 U.S. at 662, 95 S.Ct. 1191. Even the *Austin* excerpt that plaintiffs cite illustrates this purpose:

> Since nonresidents are not represented in the taxing State's legislative halls, judicial acquiescence in taxation schemes that burden them particularly would remit them to such redress as they could secure through their own State; but to prevent (retaliation) was one of the chief ends sought to be accomplished by the adoption of the Constitution.

*Id.* (quotation and citation omitted). Thus, in *Austin*, the Court acted to preserve harmony among the states in order to maintain "our constitutional federalism," not to protect citizens unrepresented by the taxing legislature. *Id.*

Similarly, in *Metropolitan Life*, the Court struck down tax laws favoring residents in an effort to limit states' power exerted against "the residents of other state members of our federation." 470 U.S. at 878, 105 S.Ct. 1676 (quoting *Allied Stores*, 358 U.S. at 533, 79 S.Ct. 437). The discriminatory tax was unconstitutional there because the state had "erected barriers to foreign companies who wish to do interstate business in order to improve its domestic [companies'] ability to compete at

---

**12.** Justice Brennan made clear that, in the area of state taxation, the Equal Protection Clause is "an instrument of federalism" and that it operates to "maintain this principle·of federalism" in the same manner as the Commerce and Due Process Clauses operate to regulate commerce among the states. *Id.* at 532, 79 S.Ct. 437.

home," *id.*, not, as plaintiffs claim, "to protect outsiders against the natural bias of a State's legislature in favor of its own constituents." (Opp. at 17.)

The tax cases upon which plaintiffs rely, therefore, cannot be read to establish a rule that a tax law based on lack of representation is discriminatory and therefore illegitimate. Unlike the cases cited by plaintiffs, the commuter tax ban does not implicate federalism concerns or involve the need to restrain the exercise of state power. Thus, the cases they cite are simply inapposite.

More importantly, even if such a legal theory could be deciphered from those cases, settled principles regarding the District render it inapplicable, for it has been firmly established (understandably to the chagrin of District residents) that the District does not enjoy a traditional form of representative government. Every court to consider the question has concluded that, by virtue of the Constitution, residents of the District do not have the right to vote for members of Congress. *See Adams*, 90 F.Supp.2d at 54–55. The political powerlessness suffered by those who live in the District is a constitutionally mandated and therefore legally accepted consequence of residence in the nation's capital. *See United States v. Cohen*, 733 F.2d 128, 135 (D.C.Cir.1984) (*en banc*); *Calloway v. Dist. of Columbia*, 216 F.3d 1, 7 (D.C.Cir.2000). It is thus impossible to accept plaintiffs' premise that the Prohibition is subject to attack based on a lack of representation in Congress, given that this very lack of suffrage is constitutionally derived. Whatever abstract appeal plaintiffs' theory of representative taxation has, it is simply *not* the theory embodied in Article I of the Constitution.

The notion that District residents are represented by the whole of Congress also defeats plaintiffs' attempt to analogize the Prohibition to unconstitutionally discriminatory state tax laws. District residents are not unrepresented citizens of the taxing legislature as plaintiffs claim, instead, they have "adopted the whole body of Congress for [their] legitimate government." *Loughborough*, 18 U.S. (5 Wheat.) at 324, 5 L.Ed. 98. Residents of every state, as well as each of their congressional representatives, bear the same allegiance to the District as our nation's capital. *See Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 601, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (the District is "the city, not of a state, not of a district, but of a nation"). Thus, because the Prohibition was passed by Congress in its capacity as the District's legislature, under the analysis adopted in *Allied Stores*, plaintiffs are precluded from attacking the taxing legislature's favoritism of nonresidents. *See* 358 U.S. at 529–30, 79 S.Ct. 437.

Moreover, if anything, plaintiffs' reference to *Loughborough* (*see supra* note 11) undercuts their position. As clearly established, although District residents have no right to congressional representation, the federal government may tax them. *Loughborough*, 18 U.S. (5 Wheat) at 325, 5 L.Ed. 98. This result is permissible because "[t]here is *no* constitutional provision which so limits the power of Congress that taxes can be imposed only upon those who have political representation." *Heald*, 259 U.S. at 124, 42 S.Ct. 434 (emphasis added). Although *Loughborough* restricts Congress to uniformity in the application of its *federal taxing power* over the District, *see* 18 U.S. (5 Wheat) at 325, 5 L.Ed. 98, this axiom is inapplicable to Congress as the District's local taxing legislature. *See Neild v. Dist. of Columbia*, 110 F.2d 246, 249–52 (D.C.Cir.1940) (Congress has the "full power" to impose a gross receipts tax upon the privilege of engaging in business in the District without regard to prin-

ciples of uniformity). Thus, the holding in *Loughborough* does not limit "the power of Congress, legislating as a local legislature for the District, to levy taxes ...," *Gibbons v. Dist. of Columbia*, 116 U.S. 404, 407, 6 S.Ct. 427, 29 L.Ed. 680 (1886), and it cannot be read for the proposition that any tax passed by Congress has to treat District residents in the same manner as residents of the states.

■ Indeed, the fact that Congress functions as the District's local legislature highlights the illogic in plaintiffs' argument. *See Palmore*, 411 U.S. at 397, 93 S.Ct. 1670 ("Congress may exercise within the District all legislative powers that the legislature of a State might exercise within the State ...."); *Tidewater Transfer*, 337 U.S. at 592, 69 S.Ct. 1173 (" 'Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes.' ") (citation omitted); *La Forest v. Bd. of Comm'rs*, 92 F.2d 547, 550 (D.C.Cir.1937) (Congress has "combined powers of a general and a state government" over the District). As plaintiffs concede, states may decline to impose a nonresident income tax, and a state's decision against taxing commuters creates no constitutional problems. (*See* Opp. at 7–9; Tr. at 14.) Moreover, a state may legally refuse to grant taxing power to its municipalities, and a municipality with such power may nonetheless elect not to exercise it. Under plaintiffs' approach, however, Congress does not enjoy the same discretion as does a state or a municipality. Rather, according to plaintiffs, Congress *must* either allow the Council to tax nonresidents or do it itself, and even in the absence of the Home Rule Act, if Congress opts to tax District residents, its refusal to impose

a tax on commuters would be subject to attack as unconstitutional discrimination. (Tr. at 18–19.)

That simply cannot be so. If Congress' powers over the District are indeed commensurate to a local legislature, Congress has the same prerogative to elect not to impose a commuter tax in the District that state and local legislatures have in their own jurisdictions. In fact, because Congress acts both as local and federal legislature for the District, its legislative authority with respect to the District is much broader than that of a state. Congress has "sweeping and inclusive" powers over the District, *Neild*, 110 F.2d at 249, in "all cases where legislation is possible." *Palmore*, 411 U.S. at 407, 93 S.Ct. 1670. When it legislates for the District, Congress exercises "complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other." *Neild*, 110 F.2d at 250–51. This exceptional legislative posture even allows it to "exercise its powers as a local sovereign where it has preempted the states from exercising similar local powers." *Cohen*, 733 F.2d at 132 n. 10. In fact, as plaintiffs admit, Congress' plenary power over the District gives it the authority to withhold from the Council the power to impose income taxes altogether. (*See* Tr. at 17–18.) It therefore cannot be that if Congress chooses to tax the income of District residents, there must also be a requirement that Congress impose a commuter tax where there is no similar mandate applicable to states or municipalities.

In short, Supreme Court jurisprudence *does not* support the principle that tax legislation is subject to constitutional attack if it disfavors those without representation. But even if such a principle could

be advocated, it cannot be applied here. The political powerlessness of District residents—a situation that courts have consistently upheld as constitutionally mandated—cannot be converted into a basis for attacking Congress' failure to pass a commuter tax. The *sui generis* nature of the District and its residents, coupled with Congress' plenary power over them, creates an insurmountable wall to the application of plaintiffs' legal theory.

## II. EQUAL PROTECTION

Plaintiffs' equal protection analysis suffers from several fundamental flaws. First, plaintiffs cannot invoke equal protection principles, since District residents who work here are not similarly situated to out-of-state residents employed here. And even if they were, the Prohibition could not be invalidated under the heightened scrutiny test, but would easily pass muster under a rational basis analysis.

■■■ The Court recognizes that the constitutional safeguard of equal protection applies to protect District residents, as all citizens of the nation, from discrimination. *See Shapiro v. Thompson*, 394 U.S. 618, 641–42, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (prohibition of the provision of welfare benefits to people residing in the District for less than a year creates an improper classification and denies them equal protection of the laws); *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (segregation in District public schools because of race violates students' equal protection rights).[13] Principles of equal protection, however, require only that similarly situated people be treated similarly. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *F.S.*

*Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920) (equal protection mandates that "all persons similarly circumstanced shall be treated alike").

Plaintiffs insist that by enacting the Prohibition, "Congress has passed [a] law that makes the District different .... [T]hey have discriminated between residents and nonresidents, even though they may be sitting side-by-side at the same job, earning the same money here in the District." (Tr. at 7; *see also* Tr. at 16–17.) Because it permits a tax to be imposed upon residents, but has elected not to permit a tax of nonresidents, Congress is allegedly "discriminating between two groups of people as to whom it has the power to tax as a matter of its local powers." (Tr. at 14.)

■■■ Plaintiffs' analogy is faulty, for the residents of the District are treated under the Constitution as a distinct class that is not comparable to any other group of citizens. As consistently held by the Supreme Court, the District is constitutionally distinct from the states, *see, e.g., Palmore*, 411 U.S. at 397, 93 S.Ct. 1670; *Tidewater Transfer*, 337 U.S. at 588, 69 S.Ct. 1173; *Hepburn & Dundas v. Ellzey*, 6 U.S. (2 Cranch) 445, 452, 2 L.Ed. 332 (1805), and "[u]nlike either the States or Territories, the District is truly *sui generis* in our governmental structure." *Dist. of Columbia v. Carter*, 409 U.S. 418, 432, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). When Congress legislates for the District, therefore, "the differing treatment is the consequence not of legislative determinations but of constitutional distinctions [and the] Court is without authority to scrutinize those distinctions to determine whether they are irrational, compelling,

---

13. The principles embodied in the Fourteenth Amendment's Equal Protection Clause are applied to acts of Congress in the District through the Due Process Clause of the Fifth Amendment. *See Bolling,* 347 U.S. at 499, 74 S.Ct. 693.

or anything in between." *Adams*, 90 F.Supp.2d at 68. Whether plaintiffs lay claim to membership in a class treated differently than "non-residents in general" (Tr. at 7), or in a class treated differently than "non-residents who engage in taxable transactions within the District" (*id.* at 17), the analysis is the same. Plaintiffs' attempt to invoke equal protection principles fails because "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940).

An *en banc* decision by the Court of Appeals for this Circuit has stated as much. *See Cohen*, 733 F.2d at 137 n. 15. In *Cohen*, the Court held that procedures enacted by Congress for automatic commitment to mental institutions of federal defendants acquitted in the District did not violate equal protection principles. *Id.* at 139. It upheld the law even though federal defendants in the states were treated differently. *Id.* The majority noted, however, that if Congress lacked the power to legislate commitment procedures for federal defendants nationwide, it would be legislating for the District as its local sovereign. *Id.* at 137 n. 15. Under that scenario, the Court continued, defendants in the states would fall outside the scope of the exercise of Congress' local legislative powers, and thus "would not constitute a proper reference class for equal protection purposes." *Id.* As subjects of the District's local legislative powers, District res-

idents' equal protection argument would be "utterly frivolous." *Id.*

■ Thus, *Cohen* establishes that "[i]ndividuals within and without the District of Columbia are not similarly situated with respect to congressional legislation enacted in Congress' role as local sovereign." *Cohen*, 733 F.2d at 142–144 (Mikva, J. concurring).[14] In other words, the Constitution gives Congress permission to single District residents out by granting it much broader powers over the District than it has over the states and their residents. *See Palmore*, 411 U.S. at 397–98, 93 S.Ct. 1670. Indeed, by definition every law Congress passes as the District's local legislature treats District residents differently than the rest of the nation's citizens, but certainly, not every one of these laws violates the Equal Protection Clause. *See, e.g., Marijuana Policy Project*, 304 F.3d at 87; *Calloway*, 216 F.3d at 12.

In an attempt to salvage their equal protection claim, plaintiffs urge the Court to view this case as one "in which Congress has exercised its national power" in conjunction with its local legislative power, arguing that when it passed the Prohibition, Congress was "acting in both capacities." (Tr. at 10, 28.) They contend that if Congress had been acting purely as a local legislature, "there is absolutely no chance in the world [it] would have banned a tax on nonresident income," rather, it "would have done what every state in the Union does, which is tax all income earned" within its borders. (*Id.* at 11.) Plaintiffs claim that the imposition of taxes upon all income earned in a jurisdiction is a "univer-

---

**14.** Although the majority disagreed with Justice Mikva's concurrence to some extent, this proposition stands. Justice Mikva's analysis included the notion that Congress' actions *vis-a-vis* the District "ought to be immune from equal protection attack" *only* "when a state legislature could ... impose the same rule in its state that Congress has imposed in the

District." *Id.* at 142. The majority found this assumption unsubstantiated and too limiting, responding that "the Constitution does not contain the principle that Congress cannot exercise its powers as a local sovereign where it has preempted the states from exercising similar local powers." *Id.* at 132 n. 10.

sal principal of taxation," and conclude that "[b]y enacting the Prohibition, Congress *made the rule uniform* everywhere except in the District." (Opp. at 44 (emphasis added).) (*See also* Tr. at 19 ("Congress has put together a taxing scheme that departs from the norm everywhere else in the country . . . .").)

 The Prohibition, however, was clearly enacted under the District Clause as part of a comprehensive package for the District. When Congress enacts laws applicable to the District under its plenary District Clause powers, it usually does so as the District's local legislature. *See Brown v. United States*, 742 F.2d 1498, 1502 (D.C.Cir.1984) (*en banc*) ("Congress frequently enacts legislation applicable only to the District and . . . [a]bsent evidence of contrary congressional intent, such enactments should be treated as local law.").[15] And as discussed above, it is within a state's prerogative to decide whether to impose a nonresident income tax—a decision that would clearly not require federal powers. Similarly, when Congress makes the choice, it is a local one. *See Thomas*, 729 F.2d at 1471. Plaintiffs admit that Congress is not required to operate on behalf of the interests of the District when it acts as a local legislature (Tr. at 12), and that instead, Congress is ordinarily "presumed to legislate in the best interests of the District and its residents." (Opp. at 4.) Plaintiffs' equal protection challenge is therefore flawed, because Congress has not acted on this subject with respect to anyone else but District residents, and it is constitutionally permitted to treat them differently.[16]

It cannot be the case, furthermore, that Congress "made the rule uniform," not only because Congress has not acted with respect to any jurisdiction beyond the District, but also because the rule is not uni-

15. That is not to say that every enactment will be considered "local" under all circumstances. For example, in *Thomas v. Barry*, 729 F.2d 1469, 1471 (D.C.Cir.1984), this Circuit held that certain provisions of the Home Rule Act did not apply exclusively to the District of Columbia and consequently could provide the basis for the exercise of federal question jurisdiction. The provision at issue in *Thomas* applied "directly to the federal not the District government," because it involved the transfer of employees from the federal government to the District's newly formed one. *Id.* The Court determined that the provision at issue was not purely local because a "state or local statute [could not] direct the federal government to affect transfers or to abolish positions altering its structure in the manner [it] required." *Id.* (quoting *Key v. Doyle*, 434 U.S. 59, 68 n. 13, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977) (equating exclusively local provisions of the D.C.Code to laws "enacted by state and local governments having plenary power to legislate for the general welfare of their citizens")).

16. Plaintiffs contend that Congress *could* regulate the states with regard to commuter taxes by "pass[ing] laws saying that states can't tax commuters." (Tr. at 10.) The truth of this statement is dubious, as "[i]n our system of government the States have . . . complete dominion over all persons, property, and business transactions within their borders . . . [and][t]he rights of the several States to exercise the widest liberty with respect to the imposition of internal taxes . . . 'is an incident of sovereignty.'" *Shaffer*, 252 U.S. at 50–52, 40 S.Ct. 221 (quoting *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 429, 4 L.Ed. 579 (1819)). It is undeniable, moreover, that Congress could not pass such a law under the District Clause. Even if Congress chose to exercise some other power to legislate for the states on the issue of commuter taxation, its unique legislative posture with respect to the District would allow it to deviate from the very rule it imposed upon the states, because "[n]othing prevents Congress from mistrusting and thus overriding the local authority of the states with regard to certain matters, while leaving its own local authority, in which it may have greater confidence, unimpaired." *Cohen*, 733 F.2d at 132 n. 10.

form. Plaintiffs cite no authority to support their novel "universal principle of taxation." In fact, they concede that some states decline to impose a nonresident income tax. (*See* Opp. at 7–9.) Indeed, although state taxing authorities have the *right* to impose income tax obligations on nonresidents, *see Shaffer*, 252 U.S. at 50, 40 S.Ct. 221, there is no constitutional provision or federal statute that *requires* a taxing legislature to tax nonresident income.[17] As previously discussed, acting as the District's local legislature, Congress has the same prerogative as other taxing legislatures to decline to impose a commuter tax.

Moreover, even if every state chose to tax all income earned within its borders, the practice would not become a "rule" giving the District the right, or Congress the obligation, to do so. Instead, it would amount to a policy consensus among the states. Congress has the power to make different policy choices and depart from the practice of the states when enacting laws specific to the District, for "[t]here has never been any rule of law that Congress must treat people in the District of Columbia exactly the same as people are treated in the various states." *Cohen*, 733 F.2d at 141 (Wilkey, J., concurring). The

Council, moreover, was created by Congress, exercises only those powers granted to it by Congress, and has no sovereignty or *right* to tax anyone. *See Thompson Co.*, 346 U.S. at 107, 73 S.Ct. 1007 (although the District is a "separate political community," its "sovereign power [is] lodged in the Congress").[18]

Simply put, under the Constitution and the Home Rule Act, the District and its residents are the subjects of Congress' unique powers, exercised to address the unique circumstances of our nation's capital. Neither state practices nor the rest of the nation's citizens constitute a proper reference class for purposes of challenging the Prohibition. Moreover, even assuming *arguendo* that plaintiffs are entitled to invoke the protections of Equal Protection Clause to challenge the Prohibition, they are not entitled to the application of a heightened level of scrutiny, and thus, the law must be upheld under the less exacting rational basis test.

## A. Standard of Review

### 1. Heightened Scrutiny

■ "Most laws will survive equal protection challenge if they bear a rational

17. Maryland and Virginia do not impose taxes upon District residents who earn income within their borders. (*See* Maryland's Mot. to Dismiss at 6 n. 8; *Amicus* Brief of Fairfax County, *et al.* at 4; Tr. at 7.) Although many of the jurisdictions that elect not to tax commuters either impose no income tax at all, or reach reciprocal agreements with other jurisdictions to mutually forego nonresident tax collection, those exceptions nonetheless undermine the "universality" of the practice and illustrate its optional nature.

18. Perhaps the more appropriate analogy in this circumstance is between a state and its municipality. As a municipal subordinate of Congress, the District's taxing rights are only as broad as the sovereign grants. *See, e.g., City of New York v. State*, 94 N.Y.2d 577, 709

N.Y.S.2d 122, 730 N.E.2d 920, 926 (2000) ("Although the State appropriately authorized the City to implement the commuter tax, it never ceded its taxing authority to the City."); *Griffin v. Anne Arundel Co.*, 25 Md.App. 115, 333 A.2d 612, 619 (1975), *cert. denied*, 275 Md. 749 (1975) ("Since the power to tax is an inherent attribute of sovereignty and since a County is only an agency or subdivision of the State, it is fundamental that the power of a County [or a municipality] to tax is not inherent but is a delegated power and exists only when and to the extent granted by the State."). Maryland has declined to grant taxing power to Baltimore, for example, a legislative decision that plaintiffs do not claim is unconstitutional. (Maryland's Mot. to Dismiss at 5 n. 8; Tr. at 19–21.)

relationship to a legitimate governmental purpose .... More searching scrutiny is reserved for laws that either burden a suspect class or impinge upon a fundamental interest." *Calloway,* 216 F.3d at 6 (citing *Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). Because the Court finds neither, heightened scrutiny of plaintiffs' equal protection claim is inappropriate.

Plaintiffs base their argument that the Prohibition "must be subjected to heightened scrutiny" upon the same tax cases they invoke to allege the illegitimacy of a discriminatory tax based on lack of representation. (*See* Opp. at 18.) They admit, however, that heightened scrutiny is not referenced in any of those decisions applying an equal protection analysis. (Tr. at 30–31.) Instead, the Court conducted a rational basis inquiry with respect to these tax cases, concluding that the "promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose." *Metro. Life,* 470 U.S. at 882, 105 S.Ct. 1676.[19] Plaintiffs insist, nonetheless, that some heightened level of scrutiny is appropriate because the remainder of the tax cases they cite implement a "more rigorous" standard of review. (Opp. at 18 (citing *Austin,* 420 U.S. at 663, 95 S.Ct. 1191).) These decisions, including *Austin,* were decided on the basis of the Privileges and Immunities Clause, and at most, require a "substantial reason for the difference in treatment." *Lunding,* 522 U.S. at 298, 118 S.Ct. 766.

To the extent that the reasoning of these decisions is applicable to an equal protection analysis, none of them establish that strict scrutiny of plaintiffs' equal protection claim is appropriate.

Nor have plaintiffs established the infringement of a fundamental interest sufficient to warrant a heightened level of scrutiny. As discussed above, they have failed to establish a *per se* rule of illegitimacy with respect to a discriminatory tax based on a lack of representation. Plaintiffs cannot argue that whenever "a legislature discriminates—in a matter of taxation—in favor of its own constituents and against people who are not represented, the Courts will scrutinize this discrimination closely." (Opp. at 5.) Furthermore, as the Court has established, the imposition of taxes upon all income earned in a jurisdiction is not a "universal principle of taxation" that can be used to argue for the existence of a fundamental right. Thus, plaintiffs have failed to present any "fundamental interest" that Congress has breached through its decision to deprive the District of the right to tax commuters.

Plaintiffs' argument that District residents constitute a suspect class is likewise unavailing. "Suspect class" status is reserved for classifications that "are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). District

---

**19.** *See also Williams v. Vermont,* 472 U.S. 14, 23, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985) (striking down a tax because there was "no legitimate purpose ... furthered by [the state's] discriminatory exemption" for state residents); *WHYY, Inc. v. Glassboro,* 393 U.S. 117, 120, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968) (striking down a tax discriminating against nonresidents because the state could advance no "distinction between [foreign] and domestic [companies] which would justify the in-

equality of treatment"); *Allied Stores,* 358 U.S. at 527, 79 S.Ct. 437 (applying the standard that discrimination in taxation must have "a rational basis and may not [be] a classification that is palpably arbitrary"); *Wheeling,* 337 U.S. at 572, 69 S.Ct. 1291 (striking down the tax because "the inequality is not because of the slightest difference in Ohio's relation to the decisive transaction, but solely because of the[ir] different residen[ce]").

residents are subject to different treatment when Congress legislates pursuant to the District Clause, not because of a legislative determination, but as a consequence of constitutional distinctions. *See Adams,* 90 F.Supp.2d at 68. It would be illogical, therefore, to determine that the classification at issue is suspect, because it "is not the product of presidential, congressional, or state action ... [but] is one drawn by the Constitution itself." *Id.* at 66. "[I]n a sense the Constitution itself establishes the rationality of the ... classification, by providing a separate federal power which reaches only [District residents]." *Cohen,* 733 F.2d at 139; *cf. United States v. Antelope,* 430 U.S. 641, 649 n. 11, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) ("[T]he Constitution itself provides support for legislation directed specifically at the Indian Tribes .... [T]he Constitution therefore singles Indians out as a proper subject for separate legislation.").

Despite the holdings in *Adams* and *Cohen,* plaintiffs insist that there is a "fundamental difference" between this case and others, because when enacting the Prohibition, "there was a direct conflict of interest between the constituents [of Congress] who were represented and the citizens in the District who are not represented." (Tr. at 32.) This argument simply amounts to the contention that District residents' lack of congressional representation requires the Court to consider their classification suspect. Indeed, plaintiffs admit that if the District had voting representation in Congress, and yet Congress still declined to pass a commuter tax for the District, they would have a "harder case." (Tr. at 33.) Unfortunately for plaintiffs, the *en banc* Court in *Cohen* flatly rejected the argument that District residents warrant classification as a suspect class because of their inability to vote for a congressional representative: "[E]ven if one accepts the thesis that the class in

question is residents of the District of Columbia, the mere lack of the ballot does not establish political powerlessness, or, if it does, political powerlessness alone is not enough for 'suspect class' status." *Cohen,* 733 F.2d at 135.

The Court of Appeals recently affirmed *Cohen* 's holding in *Calloway,* where it applied rational basis review to Congress' discriminatory treatment of District residents with respect to an attorneys' fees provision of the federal Individuals with Disabilities Education Act. 216 F.3d at 6–7. Dismissing the request for a heightened level of scrutiny, the Court stated that it "may not now depart from the *en banc* court's conclusion that D.C. residents do not comprise a suspect class for equal protection purposes." *Id.* at 7. Nor does this Court have the ability to depart from these holdings and is thus constrained to conclude that District residents do not constitute a suspect class. With no basis to justify heightened scrutiny of plaintiffs' equal protection claim, the rational basis analysis is the appropriate framework to be applied.

### 2. Rational Basis

█ Pursuant to this test, the Court must decide whether "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The rational basis inquiry is "highly deferential," *Calloway,* 216 F.3d at 9, and is "not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller,* 509 U.S. at 319, 113 S.Ct. 2637. Any plausible reason for Congress' action is sufficient for purposes of a rational basis analysis, *see United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), and absent some reason to infer irrationality,

# 22

the statute will survive review. *See Calloway*, 216 F.3d at 9 (citing *FCC v. Beach Communications*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).[20]

Defendants have offered several viable reasons for Congress' incorporation of the Prohibition into the Home Rule Act. The Act itself was crafted by Congress to strike a careful compromise between its unique constitutional responsibility for the nation's capital and the District's desire for self-government. It limited the District's ability to fully maximize its earning potential in many ways, one of which is its incapacity to tax commuters, but offset those provisions with yearly federal payments to the District. It is rational to conclude that the Prohibition is an attempt to ensure that all of the nation's taxpayers make a fair financial contribution to the nation's capital through these federal appropriations, rather than disproportionately burdening the states that surround the District for its support. *See Statement by the President Upon Signing the Bill into Law*, 9 Weekly Comp. Pres. Doc. 1483 (Dec. 24, 1973) ("As the principal employer in Washington, D.C., the Federal Government recognizes its responsibility to pay its fair share of the operations of the District government.").

Defendants and the intervenors also cite the promotion of business in the District as a rational basis for the Prohibition. "Economic development [is a reason] Congress might well have had in mind when it decided not to let the [District] impose a tax on nonresidents . . . . [I]f Virginians have to pay high taxes to work on this side of the river, they might as well stay on the other side and pocket the difference." (Tr. at 66–67.) This purpose is entirely legitimate and has consistently been found to provide a rational basis. Indeed, "it has repeatedly been held and appears to be entirely settled that a statute which encourages the location within the State of needed and useful industries by exempting them . . . from its taxes is not arbitrary and does not violate the Equal Protection Clause." *Allied Stores*, 358 U.S. at 528, 79 S.Ct. 437. When Congress, as the District's local legislature, attempts to encourage the development of business within its borders by exempting nonresidents from income tax obligations, its conduct is equivalent to Ohio's efforts to benefit its economy by allowing nonresidents to purchase and operate warehouses free from taxes in *Allied Stores*. *Id.* at 529, 79 S.Ct. 437. Both are legitimate.[21] In fact, Congress has an especially unique motivation to attract employees to this city, as the nation's capital, and conceivably would want to encourage

---

**20.** The Court is mindful of the fact that the privileges and immunities cases plaintiffs cite require the taxing legislature to demonstrate a "substantial reason" for the discriminatory tax. *See, e.g., Lunding*, 522 U.S. at 298, 118 S.Ct. 766. Although, for reasons explained *infra* at Section IV, the Court does not believe that those cases provide an appropriate framework for resolving this case, even if that standard could be invoked, defendants have provided sufficient justification to sustain the Prohibition.

**21.** Plaintiffs' attempt to defeat any rational basis on the basis of the tax cases they cite cannot succeed, even though the tax laws in those cases (except in *Allied Stores*) were

found to have no rational basis. In those cases, the "promotion of domestic business by discriminating *against* nonresident competitors," as opposed to *for* them, was deemed illegitimate. *Metro. Life*, 470 U.S. at 882, 105 S.Ct. 1676 (emphasis added). Moreover, as discussed in *Allied Stores*, the distinction made here does not rest upon the "different residence of the owner" but upon a "state of facts that reasonably can be conceived to constitute a distinction, or difference in . . . policy, which the State is not prohibited from separately classifying for purposes of taxation . . . ." *Allied Stores*, 358 U.S. at 530, 79 S.Ct. 437.

federal government service through tax exemptions.

A rational basis can also be found "in the concept that it is proper that those who are bound to a State by the tie of residence and accordingly more permanently receive its benefits are proper persons to bear the primary share of its costs." *Allied Stores,* 358 U.S. at 533, 79 S.Ct. 437 (Brennan, J., concurring). As intervenors point out, District "residents receive the benefit of the income tax that's being raised to a degree that cannot possibly be shared by nonresidents" by enjoying "an array of services that are not used by the Virginians who come here or those coming here from Maryland." (Tr. at 60, 65.) Congress could well have believed that the "businesses [in the District] are net tax producers," while the residents "are net tax consumers." (Tr. at 65.) The Prohibition thus not only promotes tax revenue generators within District borders, but it reasonably places the primary fiscal responsibility for services upon those who enjoy them.

Plaintiffs allege that Congress chose to forbid the District from taxing nonresident income in an effort to benefit their own constituents at the expense of the District, attempting to conjure suspicions of animus—and negate any perceived rational basis—by citing various comments in opposition to a commuter tax by members of Congress. (*See, e.g.,* Opp. at 43 (quoting *Commuter Tax: Hearings and Markup on H.R. 11303 & 10116 Before the Subcomm. on Fiscal Affairs and the House Comm. on the District of Columbia,* 95th Cong. 190 (1978) (statement of Rep. Harris) ("[I]t is impossible to be altruistic when it comes to the commuter tax question.")).) The Court, however, cannot invalidate legislation based on statements by individual legislators during debate "which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *United States v. O'Brien,* 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Moreover, despite the arguments in the *amicus* brief filed on behalf of plaintiffs' position, "it has long been settled that a classification, *though discriminatory,* is not arbitrary nor violative of the Equal Protection Clause ... if any state of facts reasonably can be conceived that would sustain it." *Allied Stores,* at 528, 79 S.Ct. 437 (emphasis added). Plaintiffs themselves concede that if the Council had the power to tax nonresidents but chose not to implement it, "[t]here would be a discrimination" that would nonetheless withstand constitutional challenge for the reasons articulated in *Allied Stores.* (Tr. at 75.) Therefore, although *amici* for plaintiffs present a compelling argument that the District is treated inconsistently and unfairly by the Prohibition, this discrimination does not violate the Equal Protection Clause. Defendants offer a host of possible rational reasons for this legislation, and thus, the Court cannot conclude that Congress has acted improperly or irrationally in violation of the Equal Protection Clause.

## III. THE UNIFORMITY CLAUSE

Plaintiffs fare no better under the Uniformity Clause, which provides that "Duties, Imposts and Excises [imposed by Congress] shall be uniform throughout the United States." U.S. Const., Art I, § 8, cl. 1. Although the Prohibition amounts to neither a direct nor indirect tax *imposed* by Congress, plaintiffs' Uniformity Clause claim rests on the proposition that a violation can result from legislation exempting a particular geographic region from taxation or forbidding a specific region from imposing a tax. (*See* Opp. at 7, 48 ("[Congress has] discriminat[ed] against a single geographic region—the District—and

treat[ed] it differently from the States and territories.") (citing *United States v. Ptasynski,* 462 U.S. 74, 85, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983) (when a tax exemption is framed in geographic terms, it should be examined to see if there is actual geographic discrimination)).) Thus, their Uniformity Clause argument is grounded upon their claim that by enacting the Prohibition, Congress "made the rule"—that income is taxed where it is earned regardless of the residence of the earner—"uniform" everywhere but in the District.[22] They invoke *Loughborough* to support their contention that "[f]or people not represented ... their protection comes from the principle of equality, that they have to be treated ... the same as the people who do have the right to vote ... in taxation matters." (Tr. at 24.)

To the extent that such an analysis is appropriate, the principles of uniformity advanced in *Loughborough* and ensured by the Uniformity Clause simply do not apply to this case. That Clause limits Congress' powers of commerce and taxation, *see Ptasynski,* 462 U.S. at 81, 103 S.Ct. 2239, and is not a limitation upon Congress when it enacts laws applicable specifically to the District under the District Clause. For, as recognized by the D.C. Circuit:

> It has long been established that Congress may constitutionally impose excises in the territories which it governs directly, without making such excises generally applicable to the country at large. Many District of Columbia taxes are excises and have been upheld. The uniformity requirement was not mentioned in any of these District of Colum-

bia cases, but the omission seems to indicate that it was deemed to be a settled question. The courts sustained the taxes without referring to this constitutional restriction.

*Mercury Press, Inc. v. Dist. of Columbia,* 173 F.2d 636, 637 (D.C.Cir.1948).

As with their attempts to apply equal protection principles, plaintiffs' uniformity argument is premised on the faulty assumption that the Prohibition represents legislation of a national character. (*See* Tr. at 28.) As discussed above, *Loughborough* only restricts Congress to uniformity in the application of its *federal* taxing power over the District, *see* 18 U.S. (5 Wheat) at 317, 5 L.Ed. 98, and cannot be used to support the claim that the District is protected by a right of equal treatment against congressional tax laws passed pursuant to the District Clause. Indeed, plaintiffs admit that if Congress had legislated solely "as a local legislature for the District, to levy taxes for District purposes only, in like manner as the legislature of a State may tax the people of a State for State purposes only," then the Uniformity Clause would not apply. (Tr. at 27–28 (quoting *Gibbons,* 116 U.S. at 407, 6 S.Ct. 427, and citing as an example of a permissible local tax a congressional sales tax imposed "only in the District of Columbia to raise revenues for support of the District government").)

Plaintiffs, nonetheless, cite *Binns v. United States,* 194 U.S. 486, 491, 24 S.Ct. 816, 48 L.Ed. 1087 (1904), in an effort to convince the Court that the Prohibition can be considered a "local tax" for Unifor-

---

22. Plaintiffs allege that "Congress may not impose income taxes at one rate for one state or area, and at a different rate for another state or area." (Compl.¶ 59.) They draw an analogy to a hypothetical version of the recent Internet Tax Freedom Act, 47 U.S.C. § 151 (2002), to explain their Uniformity Clause ar-

gument. That legislation forbids any state from imposing taxes upon the internet. "Had Congress instead passed a law forbidding only the State of Rhode Island from taxing the internet, the law would not be uniform [and] would certainly be unconstitutional." (Opp. at 46.)

mity Clause purposes *only* if it has the "purpose" of providing revenue for the District. (*See* Opp. at 48.) In *Binns*, the application of Congress' taxing power discriminatorily applied to Alaska was upheld because the purpose of the special tax was to raise revenue for use in Alaska and the total revenues it earned did not exceed the federal expenses there. *Id.* at 494–95, 24 S.Ct. 816. The Prohibition clearly does not pose the problem sought to be prevented by the Court in *Binns*, because the federal government is not overburdening a particular region with a tax "for the benefit of the nation as distinguished from that necessary for the support" of the District. *Id.* at 496, 24 S.Ct. 816. *Binns* is also inapposite because Alaska was taxed under Congress' general taxing power, not its District Clause powers.

Instead, as previously discussed, whether a provision of the Home Rule Act represents national or local legislation is determined, not by its purpose or effect, but rather, by the power invoked. *See Key*, 434 U.S. at 68 n. 13, 98 S.Ct. 280; *Thomas*, 729 F.2d at 1471. As local legislation passed pursuant to the District Clause, there is no basis under the Uniformity Clause to validate the Prohibition.

And even if the Uniformity Clause were applicable, Congress enacted the Home Rule Act and its individual provisions regarding taxation in order to address a geographically-isolated situation, which is entirely permissible despite the overarching goal of uniformity. *See Ptasynski*, 462 U.S. at 83–84, 103 S.Ct. 2239 ("[T]he uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve

geographically isolated problems.") (quoting *Blanchette v. Connecticut General Ins. Corp.*; *Region Rail Reorganization Act Cases*, 419 U.S. 102, 161, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)). The Prohibition here is therefore constitutionally permissible, as the Constitution itself creates the District as a geographically-isolated situation appropriate for selective legislation.

## IV. THE PRIVILEGES AND IMMUNITIES CLAUSE

 Plaintiffs collapse their privileges and immunities claim with their equal protection claim because, as noted above, almost half of the tax cases they rely on to construct their theory were decided under the Privileges and Immunities Clause. These cases require a "substantial reason for the difference in treatment" where nonresidents are subject to a more burdensome tax than residents of the taxing state, because of the protections afforded all state citizens by the Privileges and Immunities Clause in Article IV of the Constitution. *See Lunding*, 522 U.S. at 298, 118 S.Ct. 766.[23] Article IV's privileges and immunities, however, provides "a limitation upon the states only and in no way affects the powers of Congress over the District of Columbia," *Neild*, 110 F.2d at 249 n. 3; *see also Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C.Cir.1939), and thus, the application of the principles contained in these cases to the instant challenge is highly questionable.

It is likewise unclear whether plaintiffs can import the privileges and immunities principles of the Fourteenth Amendment to the District. Although equal protection principles are incorporated into the Fifth

**23.** The other decisions plaintiffs cite that apply a Privileges and Immunities Clause analysis are *Austin v. New Hampshire*, 420 U.S. 656, 666, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975); *Travis v. Yale Mfg. Co.*, 252 U.S. 60, 79, 40 S.Ct. 228, 64 L.Ed. 460 (1920); and *Ward v. Maryland*, 79 U.S. (12 Wall) 418, 430, 20 L.Ed. 449 (1871).

**26**

Amendment and are thus applicable within the District, *see Bolling,* 347 U.S. at 500, 74 S.Ct. 693, it has not been established whether the Fourteenth Amendment's Privileges and Immunities Clause would also apply. *See Adams,* 90 F.Supp.2d at 68 n. 66.

 But even if plaintiffs can apply the privileges and immunities of citizenship to Congress' enactment of the Prohibition, there is no right of national citizenship abridged by this legislation. "Privileges and immunities of citizens of the United States are only such as arise out of the nature and essential character of the National Government, or are specifically granted or secured to all citizens or persons by the Constitution of the United States." *Jones v. Helms,* 452 U.S. 412, 418 n. 12, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981) (quotation and citation omitted). District residents have no right to demand that commuters be taxed, just as the District Council has no right to tax them. Insofar as plaintiffs' complaint is grounded upon District residents' denial of the vote, the *Adams* decision makes clear that this approach cannot succeed. *See Adams,* 90 F.Supp.2d at 70 ("[D]enial of the vote to [District] residents does not abridge their national privileges or immunities ... [because it] is not the consequence of the addition of any extra-constitutional qualification on voting .... Rather, it is the result of applying precisely those qualifications contained in the Constitution itself."). Therefore, plaintiffs' privileges and immunities claim must also be rejected.

**CONCLUSION**

While the Court is sympathetic to plaintiffs' arguments and fully appreciates the manifest inequity created by the District's inability to tax commuters, the Court lacks the power to grant the remedy that plaintiffs seek. The Constitution and binding Supreme Court and Circuit precedent establish Congress' plenary power over the District and its residents and their unique status within our constitutional framework. Despite its apparent unfairness, the legislative scheme at issue here is not unconstitutional, and therefore, the motions to dismiss must be granted.

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Motions to Dismiss the Complaint filed by the Federal Defendants [7–1], the Commonwealth of Virginia [10–1], and the State of Maryland [8–1] are **GRANTED**; and it is

**FURTHER ORDERED** that Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE.**

**THIS IS A FINAL APPEALABLE ORDER.**