Zouras v. Hallman                        CV-03-240-SM   09/30/04

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


James B. Zouras, Individually
and on behalf of All Others
Similarly Situated,
      Plaintiff

      v.                                   Civil No. 03-240-SM
                                           Opinion No. 2004 DNH 144
Robert W. Hallman, Neil
Rossen, and Presstek, Inc.,
      Defendants


**O R D E R**


     James B. Zouras, representing a class of plaintiffs who

purchased Presstek common stock between December 10, 1999, and

August 7, 2001, brings suit alleging violations of section 10(b)

of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and

Rule 10b-5 (17 C.F.R. § 240.10b-5), against all defendants (Count

I) and violations of section 20(a) of the Act (15 U.S.C. §

78t(a)) against defendants Hallman and Rossen (Count II).  Before

the court is defendants' motions to dismiss.  FED. R. CIV. P. 9(b)

and 12(b)(6).  Plaintiff objects.  For the reasons given below,

defendants' motion to dismiss is granted.

## The Legal Standard

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). When considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), the court must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences." Cooperman v. Individual Inc., 171 F.3d 43, 46 (1st Cir. 1999) (citing Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)). However, while a court "deciding a motion to dismiss under Rule 12(b)(6) . . . must take all well-pleaded facts as true . . . it need not credit a complaint's 'bald assertions' or legal conclusions." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996) (quoting Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993)). Finally, "[d]ismissal under Fed.R.Civ.P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." Cooperman, 171 F.3d at 46 (citing

<u>Dartmouth Review v. Dartmouth Coll.</u>, 889 F.2d 13, 16 (1st Cir. 1989)).

**Background**

Defendant, Presstek, Inc., has developed and commercialized proprietary direct imaging ("DI") technology for use in color offset printing. That technology employs laser diodes to transmit digital data directly onto plates, while they are in the press. Historically, a significant portion of Presstek's sales have been to Heidelberger Druckmaschinen AG ("Heidelberg"), a manufacturer of color offset printing presses. Heidelberg used Presstek's DI technology in its Quickmaster DI printing press, but subsequently turned to Creo, a Presstek competitor, to supply DI technology for its new Speedmaster 74DI printing press. On December 10, 1999, the commencement date of the class period, Presstek announced that it was entering into arbitration proceedings with Heidelberg. Subsequently, Presstek announced its intention to: (1) develop and market a new product, the Dimension 400, a thermal computer-to-plate ("CTP") device; (2) pursue a joint venture with Xerox to market a line of direct

3

imaging presses; and (3) operate a subsidiary, Lasertel, to produce high-quality laser diodes.

The price of one share of Presstek common stock on December 10, 1999, the first day of the class period, was $13.75. During the class period, that price rose to a high of $28.75 and fell to a low of $7.20 on August 7, 2001, the last day of the class period.

Plaintiff has sued Presstek, its former Chief Executive Officer and President (Hallman), and its former Chief Financial Officer (Rossen), both of whom were Presstek officers during the class period. Plaintiff says defendants are liable for: (1) failing to adequately disclose problems with the Heidelberg relationship; (2) recklessly misleading investors concerning the commercial viability of the Dimension product line in 2000 and 2001; (3) knowingly projecting inflated sales forecasts for Xerox DocuColor units in 2001; and (4) failing to disclose severe quality control problems and production issues at Presstek's Lasertel subsidiary.

4

## Discussion

Section 10(b) of the Securities Exchange Act of 1934

provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
>
> . . .
>
> **(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, promulgated by the Securities and

Exchange Commission, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the

5

circumstances under which they were made, not misleading, or

     (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

A statement is false or misleading if the person making it has actual factual knowledge, at the time of the statement, that makes the statement false or misleading. See, e.g., Mesko v. Cabletron Sys., Inc. (In re Cabletron Sys., Inc.), 311 F.3d 11, 36 (1st Cir. 2002); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 79 (1st Cir. 2002).

> In the First Circuit, "general averments of defendants' knowledge of material falsity [do] not suffice." Gross, 93 F.3d at 991. A 10b-5 plaintiff must allege "details of [defendants'] alleged fraudulent involvement," including specifics as to what defendants had knowledge of and when. Id. To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time. See, e.g., Serabian [v. Amoskeag Bank Shares, Inc.], 24 F.3d [357,] 368 [(1st Cir. 1994)] (plaintiffs, "cit[ing] to reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements . . . satisfies the necessary pleading

6

> requirements.")  Moreover, such citation must be
> "specifically" made.  <u>Id.</u>  Recently, in <u>Shaw</u>, the Court
> ruled that merely alleging the existence of a highly
> efficient reporting system – even one that would
> logically lead to internal reports on the relevant
> subject matter – was not enough.  The Court wrote that
> such allegations "may speak to the question of <u>how</u>
> defendants might have known what they allegedly knew,
> but [they are insufficient] absent some indication of
> the specific factual <u>content</u> of any single report
> generated by the alleged reporting system."  82 F.3d
> 1224 & n. 38 (emphasis in original).

<u>In re Boston Tech., Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 57-58 (D.

Mass. 1998) (footnote omitted).


"Liability under section 10(b) and Rule 10b-5 also requires

scienter, 'a mental state embracing intent to deceive,

manipulate, or defraud.'"  <u>Cabletron</u>, 311 F.3d at 38 (quoting

<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)).  In

addition, "this circuit has rejected any rigid formula for

pleading scienter, preferring to rely on a 'fact-specific

approach' that proceeds case by case."  <u>Cabletron</u>, 311 F.3d at 38

(citing <u>Aldridge</u>, 284 F.3d at 82; <u>Greebel v. FTP Software, Inc.</u>,

194 F.3d 185, 196 (1st Cir. 1999)).

7

Complaints brought under section 10(b) are subject to a heightened pleading standard, set out in rule and statute. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "The particularity requirement is regarded by the Court of Appeals for this Circuit as being of fundamental importance." Boston Tech., 8 F. Supp. 2d at 52. Substantively, the particularity "requirement 'entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'" Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)). In addition, "the complaint must set forth specific facts that make it reasonable to believe that the defendant knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged." Boston Tech., 8 F. Supp. 2d at 53 (quoting Gross, 93 F.3d at 991 (emphasis added)).

Under the provisions of the Private Securities Litigation Reform Act ("PSLRA") of 1995:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> **(A)** made an untrue statement of material fact; or
> **(B)** omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Furthermore:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

The First Circuit has held that "[t]he PSLRA imposes requirements for pleading with particularity that are consistent

9

with [the] circuit's prior rigorous requirements for pleading fraud with particularity under Fed.R.Civ.P. 9(b)." Greebel, 194 F.3d at 188. Moreover, "[u]nder the PSLRA, the complaint must state with particularity facts that give rise to a 'strong inference' of scienter, rather than merely a reasonable inference." Cabletron, 311 F.3d at 38 (citing 15 U.S.C. § 78u-4(b)(2); Greebel, 194 F.3d at 195-96). That is, "[i]t is clear that scienter allegations now must be judged under the 'strong inference' standard at the motion to dismiss stage." Greebel, 194 F.3d at 197.

Finally, "[i]t is not the law that a 10b-5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time." Boston Tech., 8 F. Supp. 2d at 56. Rather, "[10b-5] allegations [must be organized] into discrete units that are, standing alone, each capable of evaluation." Id. at 55-56 (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).

10

A. The Heidelberg Arbitration

According to plaintiff, defendants failed to adequately disclose problems developing in the relationship between Presstek and Heidelberg. Specifically, plaintiff alleges that Presstek's actionable false and/or misleading statement is composed of: (1) a December 10, 1999, Presstek press release that stated, in pertinent part: "Presstek . . . and Heidelberger Druckmaschinen, A.G. . . . today announced they have entered into an arbitration to resolve certain conflicts concerning on-press imaging;" and (2) a December 17, 1999, report on seybold.com that stated: "Presstek said the dispute doesn't involve the Quickmaster." Plaintiff does not contend that the first statement, standing alone, was either false or materially misleading. Rather, plaintiff's claim depends upon both statements, read together. Plaintiff's claim necessarily fails, however, because the second statement cannot be attributed to Presstek.

In Cabletron, the First Circuit expressly adopted the Second Circuit's "entanglement" test for determining whether the statements of a third party may be attributed to a defendant for

11

purposes of establishing liability under section 10(b) and Rule 10b-5.

> This test requires the plaintiff to demonstrate the defendants' involvement with third-party statements:
>
>> [L]iability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree. . . . [T]he court will determine whether the complaint contains allegations which, favorably construed and viewed in the context of the entire pleading, could establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue.
>
> Schaffer [v. Timberland Co.], 924 F. Supp. [1298,] 1310 [(D.N.H. 1996)]. Entanglement also includes situations where company officials "intentionally foster a mistaken belief concerning a material fact." Elkind [v. Liggett & Myers, Inc.], 635 F.2d [156,] 163-64 [2d Cir. 1980)].

311 F.3d at 37-38 (footnote omitted). However, "an entanglement claim will be rejected if it merely suggests or assumes that company insiders provided the information on which analysts or other outsiders based their reports." Id. at 38 (citing Suna v. Bailey Corp., 107 F.3d 64, 73-74 (1st Cir. 1997); In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 31 (D. Mass. 1999)).

Here, plaintiff has not alleged that defendants expressly or impliedly adopted the statement reported on seybold.com, or that they placed their imprimatur on that statement. The quotation from seybold.com plainly does not identify any specific Presstek source for the statement. Thus, plaintiff has failed to allege any facts which, if proven, would demonstrate significant and specific entanglement between Presstek and seybold.com. See Cabletron, 311 F.3d at 38 (holding that two analyst statements reporting information provided by named Cabletron executives were attributable to Cabletron under the entanglement test); Walsingham v. Biocontrol Tech., Inc., 66 F. Supp. 2d 669, 677 (W.D. Pa. 1998) (rejecting defendant's argument that certain media reports were non-actionable because "[t]he majority of the [third-party] statements identified by the defendants [as non-actionable third-party statements] contain what purports to be a direct quote of a specifically named BICO official.").

Moreover, Aldridge does not support plaintiff's position. In that case, two of the three company statements reported in the Providence Journal were directly attributed to a named company official, 284 F.3d at 79-80, while the third was "obviously"

13

attributable to company officials, <u>id.</u> at 80.  Here, by contrast, as pled in plaintiff's complaint, the statement reported by seybold.com is not obviously attributable to Presstek.  It does not directly quote either a named or an unnamed Presstek official.  It is but a paraphrase of a statement attributed to "Presstek," rather than to any specific individual.  Thus, the seybold.com statement is plausibly read as the website's own interpretation of Presstek's December 10 press release.  Finally, the mere fact that Robert Hallman has written for seybold.com at some time or another is not enough to demonstrate "entanglement between the defendants and the analysts <u>with respect to the statements at issue.</u>"  <u>Cabletron</u>, 311 F.3d at 38 (quoting <u>Schaffer</u>, 924 F. Supp. at 1310) (emphasis added).

Because plaintiff has failed to allege facts adequate to meet the entanglement test as adopted in this circuit, the seybold.com statement is not attributable to Presstek for purposes of establishing liability under section 10(b) and Rule 10b-5.  And, because plaintiff's claim of fraud surrounding the Heidelberg arbitration depends upon the seybold.com statement (Pl.'s Mem. of Law (document no. 27) at 27 n.51), plaintiff has

14

failed to state a claim on which relief can be granted with respect to the Heidelberg arbitration.


B. The Dimension Product Line

According to plaintiff, defendants recklessly misled investors regarding the commercial viability of the Dimension product line.  Specifically, he points to statements contained in four Presstek press releases (three reporting quarterly earnings, one commenting on "recent market conditions"), two third-party reports posted on industry websites, and one quarterly 10-Q filing.  In the words of plaintiff's amended complaint, "[t]he statements set forth in ¶¶ 37(a)-(g) were materially false and misleading in that they failed to disclose serious critical flaws, both with the Dimension products and their production."[1] (Am. Compl. ¶ 38.)  In plaintiff's view, when Presstek made the statements detailed in paragraphs 37(a)-(g) of his amended complaint, it was obligated to disclose that: (1) the laser diodes supplied by Lasertel for use in the Dimension product

_____

[1] More specifically, plaintiff contends that those statements are actionable because defendants: (1) initially mislabeled production delays as shipping or scheduling delays; and (2) ultimately, but belatedly, admitted to production delays, but never disclosed critical flaws in the Dimension products and in the production process that caused the delays.

15

performed poorly; (2) the electrical boards in the Dimension product were faulty; and (3) Dimension products suffered from malfunctions caused by dust generated during the production process.

Defendants move to dismiss the Dimension-related claims on grounds that: (1) plaintiff does not allege any actionable misstatements or any statements that were so incomplete as to be misleading; (2) the forward-looking statements they made are protected by the PSLRA's "safe harbor;" (3) most of the statements plaintiff challenges consist of non-actionable puffery; and (4) plaintiff alleges no facts to support an inference that any defendant made a statement known to be materially false when it was made.  For the rules governing the duty to disclose in section 10(b) cases, defendants cite <u>Backman v. Polaroid Corp.</u>, 910 F.2d 10 (1st Cir. 1990) (en banc), and <u>Boston Technology</u>, 8 F. Supp. 2d 43.

Without addressing either <u>Backman</u> or <u>Boston Technology</u>, plaintiff counters that: (1) the amended complaint identifies defendants' misrepresentations concerning the Dimension product;

16

(2) the amended complaint pleads why those statements were false when made; and (3) defendants' misrepresentations were more than mere puffery.  Plaintiff does not, however, address defendants' invocation of the PSLRA safe harbor, although he does clarify his theory of liability on the Dimension-related claim:

> Defendants misapprehend the thrust of the Dimension allegations: Plaintiffs do not claim that Presstek failed to meet predictions as to future prospects after falsely claiming that there was strong market demand for Dimension.  Rather, the positive statements made in connection with the introduction of Dimension, e.g., encouraging response to commercial release in Q3 2000, sales expected to climb steeply in Q4 2000, conceal that Dimension was released before it was commercially viable and that purchasers of early units would have to obtain numerous repairs/upgrades.

(Pl.'s Mem. (document no. 27) 21 n.43 (emphasis added).)


In other words, plaintiff asserts that it was misleading for Presstek to issue positive statements about customer response to the introduction of the Dimension product line without also disclosing some combination of production and/or performance problems with its Dimension platesetters.  More specifically, plaintiff asserts that Presstek intentionally attempted to mislead the market by: (1) saying that the company was

17

experiencing shipping or scheduling delays, when it was actually dealing with production delays; (2) saying that the company was experiencing production delays, when it was actually dealing with production issues; and (3) saying that the company was experiencing production issues, when it was actually dealing with product performance issues; and (4) only belatedly disclosing that the Dimension platesetter was experiencing performance issues.

As noted above, section 10b-5 cases are properly "decided by a statement-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement – namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made." Boston Tech., 8 F. Supp. 2d at 55. Before analyzing each of the seven Dimension-related statements that plaintiff identifies as false and misleading, one issue common to all seven statements must be considered.

Rule 9(b) and the PSLRA require a 10b-5 claim to be pled with specificity. That requirement is especially important given

plaintiff's theory of the case.  He claims Presstek is liable not for saying that market interest in Dimension was high when it was actually low, or for saying that Dimension was a good platesetter when it was actually a poor one, but for saying that market interest in Dimension was high without also saying that Dimension was not a very good platesetter.[2]  Plaintiff's theory of liability requires not only that defendants knew about Dimension's alleged production/performance issues, but, also, that defendants understood the effect those issues would have on Presstek's bottom line.  See Cabletron, 311 F.3d at 36 (explaining that plaintiff had not shown why any of defendant's statements were materially misleading when made, in part because "[t]he supply delays might or might not have been visible to defendants [when they made their statements], but in any event it may also have been reasonable to believe they would soon be resolved").

_____

[2] In Boston Technology, the court held that a statement about the deployment of a new product and the importance of one particular customer "neither inherently concerned, nor implicitly referred to the quality or condition of the product line."  8 F. Supp. 2d at 59.

Thus, under plaintiff's theory of the case, specific allegations about what Hallman and Rossen knew, when they knew it, and what they likely would have inferred from their actual knowledge, are all vital to a claim that what they said about market acceptance was in conflict with what they knew to be true about product production and performance. See Cabletron, 311 F.3d at 36 (holding that plaintiff failed to adequately allege that a statement was misleading when made because "[t]he complaint fail[ed] to demonstrate that the problems which later plagued the SmartSwitch were known to the individual defendants by mid-March when the first two statements were made").

Plaintiff's complaint falls short in alleging factual knowledge on the part of Hallman or Rossen that would have made any of the statements attributed to them false or misleading. Only one of plaintiff's confidential witnesses, CW 1,[3] says that he or she spoke to Hallman and none claims to have spoken to

---

[3] According to plaintiff, "CW 1 is a former Presstek employee who, throughout the Class Period, supervised engineers who made product repairs and trained customers to use Dimension products." (Am. Compl. ¶ 38(a).)

20

Rossen.[4]  No dates are given for the meeting or meetings between CW 1 and Hallman, and the contents of CW 1's communication(s) to Hallman are vague, at best.[5]  Plaintiff also fails to allege any

_____

[4] Plaintiff's only allegations that Hallman had knowledge making his statements false and misleading are: (1) "CW 1 attended meetings where Hallman was present and CW 1 candidly gave assessments of Dimension's failures to Hallman." (Am. Compl. ¶ 38(a)); and (2) "CW 1 personally informed Hallman and Vice President Lieber of the known problems with the Dimension product.  Whereas this occurred at various meetings, defendants were aware that serious problems existed and were not being remedied." (Am. Compl. ¶ 39(a)).

[5] The facts alleged by plaintiff in this case contrast sharply with those alleged in Cabletron.
In Cabletron, which also involved the rollout of a new product, the SmartSwitch, "virtually every SmartSwitch manufactured from April to at least September 1997 was subject to individualized re-wiring by hand."  311 F.3d at 26-27.  Moreover:

> Information about the [SmartSwitch] problems was widely known within the company and was addressed extensively at weekly quality control meetings.  The problems were also described in two internal Cabletron databases that were routinely circulated in hard copy to managers, including to defendants Levine, Benson, and Oliver.  According to a former employee alleged to have personal knowledge, Benson directed that these reports should not be provided to salespersons "in order to insulate them (and the Company's customers) from knowledge of problems relating to SmartSwitches."

Id. at 27.
Here, plaintiff has alleged that CW 1, at unspecified times and places, provided unspecified information to Hallman, and that certain other individuals were aware of several problems with the Dimension products.  Notably missing from plaintiff's complaint are allegations of either the kind of systematic, institutional data reporting alleged in Cabletron, or the kind of deliberate

21

concrete knowledge, or a basis for inferring knowledge, on Hallman's part concerning the link between production/performance issues and revenue.  Without a more specific indication of precisely what CW 1 said to Hallman, and when, plaintiff's complaint fails to "specify . . . the reason or reasons why [any] statement [attributed to Hallman] is misleading."  15 U.S.C. § 78u-4(b)(1).  Not only does the complaint's lack of specificity preclude analysis of discrete units subject to individual evaluation, see Boston Tech., 8 F. Supp. 2d at 55-56, but the complaint also comes very close to alleging "fraud by hindsight," a liability theory long disfavored in this circuit.  See Cabletron, 311 F.3d at 36-37 (citing Gross, 93 F.3d at 991; Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)).

Having identified the complaint's general deficiency regarding specificity, the court now turns to each of the seven Dimension-related statements plaintiff claims to have been false and misleading.

---

concealment of systematically reported data alleged in that case.

22

Statement 1

In paragraph 37(a) of his amended complaint, plaintiff identifies as false and misleading the following statement, contained in Presstek's October 26, 2000, third-quarter 2000 earnings announcement:

> [CEO Robert] Hallman continued, "Drupa2000 and GraphExpo2000 demonstrated the widespread adoption of direct imaging on-press technology, which was further confirmed by the recent announcements of our partnerships with Ryobi and Xerox Corporation. The entry of Xerox into the ink-on-paper arena with the internal cylinder designed DocuColor DI series of presses is expected to expand the short run color market to which DI contributes a high level of value."
>
> "We are encouraged by the response to the recent commercial releases of our new Dimension platesetter series and Anthem plate," said Hallman. "These new products represent an area of exciting revenue potential. The Dimension, using the same ProFire DI technology used in our DI presses, in combination with the chemistry-free, highly consistent Anthem plate provide a unique opportunity in the expanding computer-to-plate market. Initial shipments of Dimension and Anthem commenced in the third quarter of 2000, and we expect volume increases in the fourth quarter and beyond."
>
> Looking forward to the fourth quarter of 2000, the company anticipates continued sequential revenue and earnings growth, subject to the risks set forth below. The company is presently focused on meeting the production challenges that come with these projected additional revenues. In addition, due to the increased industry acceptance of Presstek's technology, there is

23

> potential for accelerated revenue growth in the fourth
> quarter of 2000.

(emphasis added by plaintiff). Plaintiff asserts that the foregoing statement was false and misleading because "defendants continued to tout Dimension's acceptance" (Am. Compl. ¶ 37(a)) and because of Presstek's alleged "fail[ure] to disclose serious critical flaws, both with the Dimension products and their production" (Am. Compl. ¶ 38).

As with most of the dimension-related statements plaintiff identifies as false and misleading, statement 1 is not a single statement subject to evaluation. It is, instead, an extensive commentary that includes any number of statements. In other words, here, as in much of the complaint, plaintiff has offered "general flavor" pleading, see Boston Tech., 8 F. Supp. 2d at 56, rather than making "allegations [in] discrete units that are, standing alone, each capable of evaluation," id. at 56.

More importantly, plaintiff's claim is insufficient as a matter of law because the complaint does not adequately allege knowledge on Hallman's part that made statement 1 false or

24

misleading.  To be sure, plaintiff alleges that CW 1 attended meetings with Hallman and offered negative assessments of the Dimension product.  But absent allegations detailing when those meetings occurred and precisely what CW 1 told Hallman, plaintiff has failed to allege that Hallman made a false or misleading statement.

Moreover, plaintiff does not indicate how Presstek's failure to simultaneously disclose production problems with Dimension made it misleading to report on initial customer response to the introduction of that product line.  Presstek's ability to produce the product has, at best, an attenuated relationship to customer interest in its introduction.  It is overreaching, on the facts alleged, to argue that Presstek "touted the Dimension line as immediately successful."  (Pl.'s Mem. at 18.)  In short, "[i]t would not be reasonable to conclude from such an announcement [as Presstek made] that no [production] problems were being met." Boston Tech., 8 F. Supp. 2d at 59 (rejecting plaintiff's claim that defendant was "obligated . . . to disclose their alleged knowledge of 'technological problems with the . . . new products'").  Plaintiff's suggestion that Presstek's "statement

25

was misleading because it failed to explain that unresolved bugs in the new product would prevent its commercial acceptance," id. at 62, also falls short because "the fact that a new product might face problems in the market is obvious to a reasonable investor, and therefore omission of it is not culpable," id. at 63 (citing In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993)).

Because the complaint fails to adequately allege knowledge on the part of Hallman sufficient to make statement 1 false and misleading, and because Hallman's optimistic appraisal of customer interest did not reasonably imply that Dimension was without flaws, statement 1 is not actionable.

Statement 2

In paragraph 37(b) of his amended complaint, plaintiff identifies as false and misleading the following statement, found in dotprint.com's October 30, 2000, report on a conference call held by Hallman: "Shipments of the Dimension, worth $800,000 in Q3, are also expected to climb steep[ly]." Plaintiff offers only a generalized assertion of falsity, based upon Presstek's alleged

26

"fail[ure] to disclose serious critical flaws, both with the Dimension products and their production." (Am. Compl. ¶ 38.)

As a preliminary matter, the statement plaintiff identifies as false and misleading appeared on a third-party website rather than in a press release or other publication attributable to Presstek. However, even assuming the statement is attributable to Hallman rather than dotprint.com,[6] the complaint does not adequately allege any knowledge on Hallman's part that would make statement 2 false or misleading. Moreover, even assuming Hallman had knowledge of the problems identified by plaintiff, mere knowledge of those problems would not make the statement misleading for failure to mention them. See Boston Tech., 8 F. Supp. 2d at 53. As with statement 1, "[i]t would not be reasonable to conclude from [defendant's statement] that no [production] problems were being met." Id. at 59. Accordingly, statement 2 is not actionable.

_____

[6] While a direct quote from a company official appearing in the news media is properly attributed to the company, see Cabletron, 311 F.3d at 35, the allegedly false and misleading statement identified in paragraph 37(b) is plainly a statement by dotprint.com rather than by Hallman.

<u>Statement 3</u>

In paragraph 37(c) of his amended complaint, plaintiff identifies as false and misleading the following statement, drawn from a November 1, 2000, report found on the PFFC-online.com website:

> Presstek has named VIP Offset & Graphic Arts Supplies & Equipment Inc. a distributor for its new computer-to-plate (CTP) prepress products. According to Presstek, the distributor will service customers located primarily in New York, New Jersey, and Connecticut. <u>Among the Presstek products VIP will distribute: the Dimension Series CTP systems</u> with Anthem thermal plates, both of which were showcased for the first time at September's Graph Expo in Chicago, IL. Says Carl Brucher, Presstek's eastern regional sales manager, "<u>The quality of [these products]</u> combined with the expert guidance VIP provides to its customers surely will result in higher productivity."

(brackets and emphasis supplied by plaintiff). As with statement 2, plaintiff offers only a generalized assertion of falsity based upon Presstek's alleged "fail[ure] to disclose serious critical flaws, both with the Dimension products and their production." (Am. Compl. ¶ 38.)

Statement 3 was published by an industry website, but, because PFFC-online.com directly quoted a named Presstek

28

employee, the entanglement test appears to be met.  See Cabletron, 311 F.3d at 35 ("This court has previously attributed direct quotes of company officials in the news media to the company . . . and does so again here.") (citing Aldridge, 284 F.3d at 79-80).  Plaintiff makes no allegation, however, that the quoted employee, Presstek's eastern regional sales manager, was aware of the alleged production and performance issues that, in plaintiff's view, rendered optimistic sales projections false or misleading, much less that the quoted employee had such knowledge at the time he made the statement reported on PFFC-online.com.

In addition, the only portion of statement 3 that is remotely susceptible of an interpretation that might make it actionable is that portion added by plaintiff, in brackets. Without a copy of the actual report, which plaintiff has not provided, or specific allegations detailing the precise statements made, it is not possible to determine what the adjective "quality" modified.  Thus, plaintiff has failed adequately to "specify[] . . . the . . . content of the alleged false or fraudulent representation[]."  Arruda, 310 F.3d at 19 (citation omitted).

29

Because plaintiff has not alleged knowledge on the part of the speaker, and because the complaint lacks the necessary specificity, plaintiff has not adequately stated a claim with respect to statement 3.

Statement 4

In paragraph 37(d) of his amended complaint, plaintiff identifies as false and misleading the following statement, taken from a December 22, 2000, Presstek press release titled "Presstek Comments on Recent Market Conditions":

> Presstek, Inc. (Nasdaq: PRST) a leading provider of direct digital imaging technologies to the printing and publishing industry, commenting on recent market conditions, stated today that <u>management believes that the recent downturn in the company's stock price is not reflective of the strength of the company's ongoing operations and future business outlook</u>.
>
> <u>The company also stated it is pleased with the demand for its new Dimension CTP product</u>.

(emphasis added by plaintiff). In addition to offering a generalized assertion of falsity, plaintiff asserts that this statement is false and misleading because it "emphasized the success of Dimension." (Am. Compl. ¶ 37(d).)

30

Presstek did not "emphasize the success of Dimension" at all. It merely communicated that the company was "pleased with the demand for its new Dimension CTP product." But, again, because plaintiff has not adequately alleged contemporaneous knowledge that would make statement 4 false or misleading, and because nothing in statement 4 fairly implies a representation that Dimension was free from flaws, that statement is not actionable.

Statement 5

In paragraph 37(e) of his amended complaint, plaintiff identifies as false and misleading the following statement in Presstek's February 21, 2001, fourth-quarter 2000 earnings announcement:

> Presstek, Inc. (Nasdaq: PRST), a leading provider of direct digital imaging technology, today announced financial results for the fourth quarter and fiscal year ended December 30, 2000.
>
> Commenting on the fourth quarter, Presstek's Chief Financial Officer Neil Rossen said, "While we are pleased with the double-digit growth in revenues over the third quarter of 2000, we believe it could have been an even stronger quarter based on <u>the momentum our products are generating in the marketplace</u>." "As we previously announced, we were facing some uncertainty entering the fourth quarter about the

outlook for <u>shipment levels and schedules</u> for our new DocuColor and Dimension products. And <u>we did, in fact, experience some shipping delays</u> in the fourth quarter that kept our revenues below the upper range of what we had projected. <u>Demand, however, continues to be strong</u> and our partnerships continue to be active." President and Chief Executive Officer Robert Hallman said, "Over the course of the past few years, Presstek established and implemented several strategic initiatives to improve the company's performance. These initiatives included exploiting Presstek's technology leadership position to grow the DI press market, establishing a strong foothold in segments of the off-press computer-to-plate (CTP) markets, making chemistry-free imaging media the industry standard, and creating a strong brand identity. The solid results for fiscal year 2000 demonstrate the progress we are making with these initiatives." These include:
-- <u>Presstek's successful launch of new products at Drupa 2000</u>.

        \*      \*      \*      \*      \*

-- <u>Technological innovation, that has redefined the industry in terms of off-press applications; Dimension/Anthem's platesetter/plate system is the next generation, chemistry-free CTP</u>.

(emphasis and ellipsis supplied by plaintiff). In addition to a generalized assertion of falsity, plaintiff asserts that this statement is false and misleading because in it, "defendants continued to tout the Dimension product line." (Am. Compl. ¶ 37(e).)

32

Assuming defendants "touted" the Dimension product line,[7] statement 5 is not actionable for substantially the same reasons that the previously discussed Dimension-related statements are not actionable.  Plaintiff has not adequately alleged knowledge that would make that statement false or misleading, and the statement does not fairly imply the absence of production or performance issues with the Dimension line.

Statement 6

In paragraph 37(f) of his amended complaint, plaintiff identifies as false and misleading the following statement in Presstek's April 21, 2001, first-quarter 2001 earnings announcement:

> Our core graphics business continues to gather momentum with revenues growing to $25.8 million from $23.5 million in the fourth quarter of 2000.  Demand for product in our core business remains strong despite the general economic slowdown.  In particular, our Dimension/Anthem computer-to-plate (CTP) offering appears to be gaining widespread interest across our industry.  <u>In addition, during the first quarter we addressed many of the production delays we experienced late last year</u>.

---

[7] The statement reported in paragraph 37(e) is decidedly more measured than plaintiff suggests.

33

(emphasis added by plaintiff).  As with all the Dimension-related statements, plaintiff makes a general assertion of falsity based upon Presstek's alleged "fail[ure] to disclose serious critical flaws, both with the Dimension products and their production." (Am. Compl. ¶ 38.)  Plaintiff seems to attempt to make another claim of falsity, but it is difficult to determine the precise contours of that claim.  In addition to incorrectly stating that Presstek claimed to have resolved the Dimension production delays when, in fact, Presstek only claimed to have addressed those delays, plaintiff calls attention to Presstek's statement that "during the first quarter [it] addressed many of the production delays we experienced late last year."  However, plaintiff alleges no facts tending to show that Presstek did not address those delays, and does not appear even to argue that point.  Thus, plaintiff is left with a generalized assertion of falsity, which fails, as a matter of law, due to the failure to allege knowledge on Presstek's part that would make any portion of statement 6 false or misleading.

34

<u>Statement 7</u>

In paragraph 37(g) of his amended complaint, plaintiff identifies as false and misleading the following statement in Presstek's May 14, 2001 first-quarter 2001 10-Q: "The Company also experienced volume increases in sales of its CTP Dimension platesetter products." In addition to offering a generalized assertion of falsity, plaintiff asserts that this statement is false and misleading because in it, "defendants reaffirmed the growing success of the Dimension line." (Am. Compl. ¶ 37(g).) Defendants may well have reaffirmed the growing success of the Dimension product line, but because they did so by reporting past results, the accuracy of which plaintiff does not challenge, and because "accurate reports of past results or events are not actionable," <u>Boston Tech.</u>, 8 F. Supp. 2d at 59 (citing <u>Serabian</u>, 24 F.3d at 361), the complaint fails to state an actionable claim with regard to statement 7.

<u>Scienter</u>

In <u>Aldridge</u>, the court of appeals explained that "the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly

35

incomplete is classic evidence of scienter." 284 F.3d at 83 (citing Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001)). In Cabletron, the court held that a strong inference of scienter supported by several other factors was reinforced by an allegation that "many people within the company . . . received regular information about . . . problems which they should have realized contradicted the company's public statements about the rollout of the product." 311 F.3d at 39. Conversely, however, where a plaintiff fails to adequately allege a defendant's knowledge of facts that would make his or her statement false or misleading, it is difficult to argue that the plaintiff has adequately alleged that the defendant acted with the intent to defraud.

Here, plaintiff has failed to "state with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), that defendants made statements with an "intent to deceive, manipulate, or defraud," Cabletron, 311 F.3d at 38, or that they made false or misleading statements with a degree of "extreme recklessness that is 'closer to a lesser form of intent,'" id. (quoting Greebel, 194 F.3d at 198-99). Thus, in

addition to its other shortcomings, plaintiff's complaint does not contain an adequate allegation of defendants' scienter, which is an essential element of a successful section 10b-5 claim.  See Cabletron, 311 F.3d at 38.

Regarding scienter, plaintiff makes much of a December 22, 1997, cease and desist order issued by the Securities and Exchange Commission ("SEC") as a result of an administrative proceeding brought against Presstek.  The following excerpts from that order, SEC Release No. 39472, demonstrate that plaintiff's allegations in this case bear only a scant resemblance to the violations for which Presstek was found liable by the SEC:

> Presstek violated the antifraud provisions by falsely stating in its November 7 release that Heidelberg "has sold over 500" Quickmasters, when in fact Heidelberg had merely received that many orders.  (SEC Release No. 39472, at 7.)

> Presstek's management directly participated in preparing a report that it knew, or was reckless in not knowing, included forecasts that were far more optimistic than Presstek's contemporaneous internal projections.  (SEC Release No. 39472, at 9.)

> Presstek also violated the antifraud provisions by disseminating various Cabot Market Letters . . . that contained earnings projections that management knew, or was reckless in not knowing, greatly exceeded

37

Presstek's own forecasts and lacked a reasonable basis
. . . (SEC Release No. 39472, at 10.)

Presstek violated Section 13(a) of the Exchange Act and
Rules 13a-1 and 12b-20 thereunder, as well as the
antifraud provisions, by providing an incomplete and
materially misleading disclosure in its 1995 Form 10-K
concerning Heidelberg's delayed shipments of
Quickmaster presses and Presstek's reduced production
schedule . . . [which] referred merely to a "schedule
change requested by Heidelberg . . ." [while] fail[ing]
to describe the "schedule change" as a reduction [in
Heidelberg's order from Presstek] . . . [that reduced]
Presstek's production rate . . . by twenty-five
percent. (SEC Release No. 39472, at 10.)

(Pl.'s Mem. (document no. 27) Ex. F (emphasis in the original.)


While some superficial associations might be made between

the violations found by the SEC and the allegations plaintiff

makes in this case, those associations fade under even mild

scrutiny. For example, in the 1997 SEC action, Presstek's

disclosure of a "schedule change" was actionable fraud because

Heidelberg did not merely ask Presstek to reschedule its

shipments; Heidelberg substantially reduced its order – by

twenty-five percent. Here, by contrast, there is no allegation

that Presstek attempted to disguise a reduction in orders as a

shipping or scheduling delay. Nor is there an adequate

allegation that when Presstek announced shipping delays, those

38

who made that announcement knew that the delays were the result of production issues, or could reasonably predict that there would be performance issues with the Dimension product.[8]  In short, Presstek's SEC proceeding cannot bear the weight that plaintiff asks it to.  If anything, comparison of the prior SEC order and plaintiff's allegations in this case suggests, rather than scienter, that Presstek may have learned a lesson and attempted to do better.

## C. The Strategic Alliance with Xerox

According to plaintiff, defendants gave sales projections for 2001 that were knowingly false when made.  Specifically, plaintiff points to the following report on Presstek's third-quarter 2000 financial-results conference call, which appeared on October 30, 2000, on dotprint.com:

> The third quarter results set the platform for what should be a bonanza year for Presstek.  <u>The company</u>

---

[8] Similarly, while the SEC found that Presstek had violated the antifraud provisions by adopting and/or issuing revenue forecasts that were far more optimistic than its own internal forecasts, plaintiff in this case seeks to hold Presstek liable for making revenue projections for its entire product line that were different from the internal projections made by Xerox for two products that Presstek and Xerox planned to produce as a joint venture.

> predicts sales for 2001 running 50% above this year.
> This will come from increasing consumables sales and
> from sales of the Xerox DocuColor 400, built by Adast,
> and the DocuColor 233, the OEM version of the Ryobi
> Direct Image press.  Shipments of the Dimension 400
> platesetter, worth $800,000 in Q3, are also expected to
> climb steeply.

(Am. Compl. ¶ 51 (emphasis added by plaintiff).)  Defendants are entitled to dismissal of the Xerox-related claim because the statement at issue is a third-party statement that, like the Heidelberg statements, fails to meet the First Circuit's entanglement test.


D. The Lasertel Subsidiary

According to plaintiff, defendants materially misled investors by failing to disclose production problems experienced by its Lasertel subsidiary.  Specifically, he points to statements published on Lasertel's website and five Presstek press releases (three reporting quarterly earnings, one commenting on "recent market conditions," and one announcing a repositioning of the Lasertel subsidiary).  Plaintiff asserts that the six identified statements were materially false and misleading because they recklessly failed to disclose known problems at Lasertel.  In plaintiff's view, when Presstek made

40

the statements alleged to be false and misleading, it was obligated to disclose that Lasertel had no consistent procedures for growing laser wafers, for acid-etching the wafers, or for reactive ion etching (due to a lack of automation). According to plaintiff, these defects in the production process caused Lasertel to produce low-quality laser diodes that lacked durability.

Defendants move to dismiss the Lasertel-related claims on grounds that: (1) they are time-barred; (2) plaintiff has not alleged any false statement concerning Lasertel; (3) the Lasertel-related statements were not misleadingly incomplete; (4) the Lasertel allegations do not adequately allege materiality; and (5) plaintiff has failed to plead scienter regarding the Lasertel allegations. Plaintiff counters that: (1) defendants made false and misleading statements regarding Lasertel; (2) the amended complaint pleads with particularity why those statements were false when made; (3) defendants' false statements and omissions were material; (4) defendants' misrepresentations cannot be immunized by unspecific "cautionary language;" (5) defendants' misrepresentations concerning Lasertel were not

41

puffery; (6) Lasertel's misrepresentations and omissions were made with scienter; and (7) the Lasertel allegations are timely.

Defendant is entitled to dismissal of the Lasertel allegations because they are untimely.

According to plaintiff's amended complaint, the market realized, no later than July 26, 2001, that defendants had previously made false and misleading statements about Lasertel's viability and market-readiness. (Am. Compl. ¶ 80.)[9] Plaintiff's original complaint was dated May 30, 2003, and was filed on June 2, 2003, while his amended complaint was dated and filed December 15, 2003.

Until the enactment of the Sarbanes-Oxley Act on July 30, 2002, "the statute of limitations applicable to . . . federal

_____

[9] Plaintiff now argues that the first "storm warnings" he received came in Presstek's March 29, 2002, Form 10-K for 2001, which announced the reversal of a sale due to a customer return that was related to product quality. (Pl.'s Sur-Reply (document no. 36) at 3.) Plaintiff's argument is not persuasive, given the plain affirmation, in paragraph 80 of his complaint, that the market realized, as a result of Presstek's July 26, 2001, statement, that previous Presstek statements had been false and misleading.

42

securities claims barred all actions if they were filed more than one year after the discovery of the facts constituting the violation." Glaser v. Enzo Biochem, Inc., 303 F. Supp. 2d 724, 732 (E.D. Va. 2003) (citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991)). However, the Sarbanes-Oxley Act established a new, more generous statute of limitations, providing, in pertinent part:

> a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of (1) 2 years after the discovery [of] the facts constituting the violation, or (2) 5 years after such violation.

Glaser, 303 F. Supp. 2d at 733 (quoting 28 U.S.C. § 1658(b)).

Not surprisingly, plaintiff argues that this case is governed by the new, two-year statute of limitations while defendants argue that the old, one-year statute applies, or, in the alternative, that even if the two-year statute applies, the Lasertel allegations are still time-barred because they were first raised in the amended complaint and do not relate back to the initial complaint. Because plaintiff's claims are subject to

43

the one-year statute of limitations, there is no need to address the question of relation back.

"The Historical and Statutory Notes [to the Sarbanes-Oxley Act] provide that this 'limitations period . . . shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002].'" Glaser, 303 F. Supp. 2d at 733 (quoting Pub. L. 107-204 § 804(b), 116 Stat. 801 (2002)). In plaintiff's view, the fact that he filed his original complaint after July 30, 2002, requires a conclusion that the two-year Sarbanes-Oxley statute of limitations applies.

However, by the time the Sarbanes-Oxley Act became effective, the applicable one-year statute of limitations had already run on plaintiff's claim. As has been widely held, the Sarbanes-Oxley Act's enlargement of the statute of limitations for securities fraud claims did not revive claims already time-barred by the date of its enactment. See, e.g., In re Worldcom, Inc. Sec. Lit., No. 02 Civ.3288(DLC), 2004 WL 1435356, at *7 (S.D.N.Y. June 28, 2004) ("Sarbanes-Oxley does not revive

previously time-barred private securities fraud claims."); Lieberman v. Cambridge Partners, L.L.C., No. Civ.A. 03-2317, 2004 WL 1396750, at *3 (E.D. Pa. June 21, 2004); Newby v. Enron, (In re Enron Corp. Sec., Derivative & "ERISA" Litig.), No. Civ.A. H-01-3624, 2004 WL 405886, at *17 (S.D. Tex. Feb. 25, 2004); Glaser, 303 F. Supp. 2d at 734; Great S. Life Ins Co. v. Enter. Mortg. Acceptance Co. (In re Enter. Mortg. Acceptance Co. Sec. Litig.), 295 F. Supp. 2d 307, 317 (S.D.N.Y. 2003); In re Heritage Bond Litig., 289 F. Supp. 2d 1132, 1148 (C.D. Cal. 2003).[10] Those decisions hinge on the principle that "[w]hile Congress may enlarge a limitations period, Congress' acts do not revive a cause of action that has become time-barred unless Congress specifically provides for retroactive application." Glaser, 303 F. Supp. 2d at 733 (citing Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 950 (1997)).

---

[10] The one opinion that goes the other way, Roberts v. Dean Witter Reynolds, Inc., No. 8:01-CV-2115-T-26 (EAJ), 2003 WL 1936116, at *2-*4 (M.D. Fla. Mar. 31, 2003), relies largely on legislative history, and has been widely criticized. See, e.g., Lieberman, 2004 WL 1396750, at *3 n.12 ("Roberts . . . reached the opposite conclusion, but its reasoning rests on unpersuasive citations to the [Sarbanes-Oxley Act]'s legislative history. The Court agrees with those courts that have concluded that Roberts should be rejected.") (citing Enron, 2004 WL 405886, at *12 n.39; Enter. Mortgage, 295 F. Supp. 2d at 316-17).

Here, the Sarbanes-Oxley Act does not provide for retroactive application and, as a consequence, plaintiff's claim is governed by the one-year statute of limitations, under which he had until June 25, 2002, to file suit based upon the Lasertel allegations. He did not do so. By the time he did file his initial complaint, in 2003, any claim based upon the Lasertel allegations was time-barred. Accordingly, defendants are entitled to dismissal of the Lasertel allegations.

**Conclusion**

Plaintiff has failed to state a claim under section 10(b) of the Securities Exchange Act, and, because he has no section 10(b) claim, his claim under section 20(a) must necessarily fail. See Aldridge, 284 F.3d at 84 ("there must be a primary violation [of section 10(b)] for liability under section 20(a)"); Greebel, 194 F.3d at 207 (citing Suna, 107 F.3d at 72). Accordingly, defendants' motions to dismiss (document nos. 23 and 25) are granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 30, 2004

cc: Alexander J. Walker, Esq.
    Avi N. Wagner, Esq.
    Brian E. Pastuszenski, Esq.
    Paul B. Kleinman, Esq.
    Robin A. Freeman, Esq.
    Peter G. Callaghan, Esq.